MARY ELIZA HYNES *et al.*, Respondents, *against* KATE MCDERMOTT *et al.*, Appellants.

(Decided April 3d, 1882.)

Upon a question of the validity of a marriage and the legitimacy of children, any presumption in which a jury may indulge for the purpose of arriving at a verdict in favor of such marriage and legitimacy, if founded upon any evidence whatever, will be sustained by the court.

Upon the trial of such an issue, the jury found, in answer to questions specially submitted to them, that the parties to the alleged marriage, in England, entered into an agreement to be then and from thenceforward man and wife, and that they did thenceforward cohabit together as man and wife; that the man was, at the time, a citizen of the state of New York, temporarily sojourning in England, and that the agreement was made with the *bona fide* intention of the parties to contract a valid marriage according to the laws of the state of New York, and to return to that state and reside there as husband and wife; that afterwards, in

France, they entered into an agreement by which they consented to take each other then and there as man and wife; that they thenceforward, in France and in England, cohabited together as man and wife; that two children thereafter born to the woman, during the lifetime of the man, were his children; and the jury found, generally, in favor of the validity of the marriage. *Held*, that as there was evidence of the facts specially found, sufficient to furnish a foundation for the presumption of marriage and legitimacy, such presumption was not overcome by proof of facts showing that the connection between the parties had been illicit in its origin; and showing, or tending strongly to show, that the name borne by the woman, previous to her connection with the man, had been given by her, in registering, as required by law, the births of the children in question at London, as the family name of the children and their parents; that subsequent to the alleged contracts of marriage, she, with his knowledge and approval, had opened a bank account for herself in such former name; that checks had been drawn by him to her order in the same name and paid to her; and that she had signed, also in the same name, a lease of a house occupied by them as a residence: and, therefore, the verdict would not be set aside as against the weight of evidence.

*Held*, further, that the law of marriage in France, in the absence of evidence as to what it in fact was, must be presumed to be the same as the common law, or the civil law, or the law of the state of New York; and as the agreement found by the jury to have been entered into between the parties in France constituted a valid marriage under any one of these laws, it must be held by the courts of this state to be a valid marriage.

The question in dispute on the trial of an action being whether the plaintiffs were the wife and children of H., deceased. a witness who had testified that she knew them and had visited them, being asked whom she saw at the time of her visit, answered, that she saw H. " and his wife, and his child," &c. *Held*, that a motion to strike out the words " and his wife and his child," was properly denied, as those words were merely descriptive of the persons, and the witness was not to be understood as intending to testify, of her own knowledge, that such persons were the wife and child of H.

In actions involving the issue of marriage, evidence of the conduct of the parties toward each other is admissible, as such conduct is frequently the very foundation of the reputation of marriage.

APPEAL from a judgment of this court entered upon the verdict of a jury and from an order denying a motion for a new trial.

William R. Hynes, a resident of New York, was accustomed to spend considerable time in Europe. In the spring of 1871, while at the Langham Hotel, London, he made the acquaint-

Hynes *v.* McDermott.

ance of the plaintiff Mrs. Hynes (who was a British subject), and an intimacy sprang up between them. In May, 1871, she was living in lodgings at 199 Cleveland street, London, being then pregnant by Hynes, and on the night of the Derby day in that month he visited her, desiring to remain with her, and she refused, complaining that he had not kept a promise of marriage that he had made to her. Mr. Hynes said that he did not believe in the marriage ceremony, but that if she would promise to be true and faithful to him he would consider her his wife, and thereupon in the presence of witnesses he gave her a ring and she took the ring, and he stayed there that night. Shortly after this, in June, 1871, Mr. and Mrs. Hynes went to Paris and stayed there some time, during the season, where they had a residence together on the Place Madeleine. In the Autumn before the birth of the eldest of the infant plaintiffs, who was born in December, 1871, they returned to England and continuously lived together, he holding her out to the world as his wife, and during this cohabitation two children were born, the one in December, 1871, and the younger in 1873. In 1874 Mr. Hynes died. Thereupon the defendants, his sisters, took possession of his estate, consisting of several pieces of real property in the city of New York, and the plaintiffs, Mrs Hynes and the two children, brought an action in ejectment as the widow and heirs at law of Mr. Hynes. Special questions were submitted to the jury, to which answers were made, and a general verdict was rendered in favor of the plaintiffs. From the judgment for the plaintiffs entered upon this verdict the defendants appealed.

*John Hallock Drake,* for appellants. — The verdict is against the clear preponderance of evidence, and on the appeal from the order denying the motion for a new trial, it is the duty of the court to set the same aside and grant such new trial (*Macy* v. *Wheeler,* 30 N. Y. 237; *Courtney* v. *Baker,* 60 N. Y. 6; *Boos* v. *World Mutual Life Ins. Co.,* 64 N. Y. 242). The judge erred in charging the jury that the marriage claimed to have been contracted was what is called a common law marriage. The presence of a priest or clergyman is

absolutely necessary to the validity of a common law marriage
(*Reg.* v. *Millis*, 10 Clark & F. 534; *Beamish* v. *Beamish*, 9
H. L. Cas. 274). The common law of this state is the common
law of England; and the statutes of the state of New York
have no force or effect outside of the state (*Davis* v. *Davis*, 1
Abb. N. C. 140; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18).
The pretended ceremony in England was not a marriage. It
was void by the laws of England, and the *lex loci contractus*
must determine the status of the parties (1 Bishop Marriage
and Divorce, § 335; Story Conflict of Laws, §§ 79–81;
*Dalrymple* v. *Dalrymple*, 2 Hagg. 54; *Scrimshire* v. *Scrim-
shire*, Id. 395; *Connolly* v. *Connolly*, 2 Eng. L. & Eq. 570;
*Herbert* v. *Herbert*, 2 Hagg. 271; *Stevenson* v. *Greely*, 17 B.
Monr. [Ky.] 193; *Medway* v. *Needham*, 16 Mass. 157; *West
Cambridge* v. *Lexington*, 18 Mass. [1 Pick.] 506; *Putnam* v.
*Putnam*, 25 Mass. [8 Pick.] 433; *Matter of Webb*, 1 Tucker,
373; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18).

*Joseph H. Choate* and *William H. Secor*, for respondents.
—The jury having found specifically that the parties contrac-
ted a marriage in France, that finding, if there was evidence to
sustain it, must end the case in the plaintiffs' favor. It was
not only permissible, but peremptory upon the jury to find
such a marriage from the facts as presented to them. The
law presumes everything in favor of the legitimacy of children,
and it is a very powerful and overwhelming presumption
(*Fenton* v. *Reed*, 4 Johns. 52; *The Breadalbane Case*, L. R.,
1 Sc. App. 182). Even without the special finding of the
marriage in France, the general verdict in the plaintiffs' favor
establishes their case upon an impregnable basis. The pre-
sumption in favor of legitimacy is so strong and absolute that
in order to defeat it the party claiming illegitimacy must
negative every possibility.

The marriage acts of Great Britain declaring all marriages
void unless solemnized in the places and according to the
formal observances prescribed by those acts, do not apply to
an American citizen whose domicil and residence is in New
York, and who marries while temporarily sojourning in

England, intending not to remain there, but to remove with his wife to America as his permanent home, and if in such a case the marriage is valid according to the law of New York, it must be sustained by our courts. There is no reason why the United States should accord to the English Marriage Act any greater extra-territorial force, or any more effect to impair the marriage of its domiciled citizens there sojourning temporarily, than the policy and laws of England accord in the like cases to foreign local statutes as affecting the marriage of English subjects under similar circumstances; and the English authorities have uniformly recognized the validity of marriages contracted by British subjects in foreign countries in accordance with the law of the domicil under similar circumstances (*Ruding* v. *Smith*, 2 Hagg. 390; *Harford* v. *Morris*, Id. 423; *Middleton* v. *Janverin*, Id. 437; *Latour* v. *Teesdale*, 8 Taunt. 830). The French authorities go even further (Duchesne, Du Mariage; Savigny, VIII. § 381). The law of America recognizes the validity of marriages of American citizens temporarily sojourning abroad, which are valid by the law of the domicil, even when they disregard provisions of the *lex loci contractus* (Story Conflict of Laws, § 113; Wharton, Conflict of Laws, §§ 170, 180, citing *Simonton* v. *Wallace*, 2 Swaby & Tr. 67; Friedburg, 127, 150, and Reinold Schmid, Die Herrschaft der Gesetze, &c., 79; 1 Wharton Evidence, 100, § 83; *Hutchins* v. *Kimmell*, 31 Mich. 133; *Newbury* v. *Brunswick*, 2 Vt. 151; *Brower* v. *Bowers*, 1 Abb. App. Dec. 214; *Loring* v. *Thorndike*, 5 Allen [Mass.] 257; *Davis* v. *Davis*, 1 Abb. N. C. 140).

VAN BRUNT, P. J.—[After stating the facts as above.]— In the foregoing statement of the case, it has not been attempted to call attention to all the grounds which were litigated during the progress of the trial, nor to give any more than a general statement of the evidence upon which the jury based their special findings:

(1) That there was a common law marriage in Cleveland Street, London, between the plaintiff Mary Eliza Hynes and William R. Hynes, on the last Wednesday of May, 1871.

(2) That the parties thenceforward cohabited together as man and wife.

(3) That William R. Hynes at the time of said marriage agreement was a citizen of the state of New York temporarily sojourning in London.

(4) That the agreement was made with the *bona fide* intention of the parties to contract a valid marriage according to the laws of the state of New York, and to return to said state and reside there as husband and wife.

(5) That the said parties while in France entered into an agreement by which they consented to take each other then and there as man and wife.

(6) That the parties thenceforward in France and England cohabited together as man and wife.

(7) That each of the infant plaintiffs was the child of the said William R. Hynes.

The evidence offered upon the part of the defendants might, if any other issue than that of legitimacy was involved, call upon the court to set aside the verdict as against the evidence. The fact that the connection was illicit in its origin ; the fact that the Registry of Births contains reasonably clear proof that Mrs. Hynes registered these children as the children of one William Saunders, and in the one case gave Mary Saunders and in the other E. Saunders as the mother, within the time limited by the British statute ; the fact that subsequently to each of these alleged marriages a bank account was opened by Mrs. Hynes in the name of Elizabeth Saunders, with the knowledge and apparent approbation of Mr. Hynes; the fact of Mr. Hynes drawing checks to the order of Elizabeth Saunders or E. Saunders ; the fact of Mrs. Hynes signing the lease for the premises in Leverton Street, London, which she occupied in 1872, in the name of Elizabeth Saunders (which it is true she denied, but which an inspection of the papers and the circumstances seem to establish) ; would seem to indicate with reasonable certainty that neither Mrs. Hynes nor Mr. Hynes was of the opinion that the marriage relation existed between them ; and as these occurrences all took place after the sojourn in Paris, they appear to negative any pre-

sumption which might be drawn that a contract of marriage had been entered into during their residence in that city. But in view of the fact that the law seems to have been settled that every presumption is in favor of marriage and of legitimacy (the extent of which presumption will presently be considered), notwithstanding this preponderance of evidence, the court should not set aside the verdict of the jury.

The first case which is to be found reported in this state is the case of *Fenton* v. *Reed* (4 Johns. 51). The question involved in that case turned upon the proof of a marriage between William Reed and Elizabeth Reed. In the year 1785 Elizabeth Reed was the lawful wife of one John Guest. Sometime in that year, Guest left the state for foreign parts, and continued absent until sometime in the year 1792; and it was reported and generally believed that he had died in foreign parts. The plaintiff, Elizabeth Reed, in 1792, married William Reed, and subsequently to the marriage, Guest returned to this state, and continued to reside therein until June, 1800, when he died. He did not object to the connection between the plaintiff and Reed, but said that he had no claim upon her, and never interfered to disturb the harmony between them.

After the death of Guest, the plaintiff continued to cohabit with Reed until his (Reed's) death in September, 1806, and sustained a good reputation in society, but no solemnization of marriage was proved to have taken place between the plaintiff and Reed subsequently to the death of Guest. Upon these facts the court held that the plaintiff was the widow of William Reed, upon the theory that there existed strong circumstances from which a marriage subsequent to the death of Guest might be presumed, the parties having cohabited together as husband and wife, and under the reputation and standing that they were such, from 1800 to 1806, when Reed died, and the wife during this time having sustained a good character in society. It was held that a jury would have been warranted, under the circumstances of this case, in inferring an actual marriage. The court seems to have laid considerable stress in the decision of that case upon

the fact that the cohabitation in its inception was with a matrimonial intent.

In the case of *Jackson* v. *Claw* (18 Johns. 345), the presumption in favor of matrimony was also adhered to. In the case of *Rose* v. *Clark* (8 Paige, 574), the doctrine of presumption was carried further than in either of the preceding cases. About 1790, Abigail Roberts married Jonas Frink at Hoosic, and after living together a short time they separated. Some time afterwards Frink married another woman and removed with her to the state of Massachusetts, and continued to reside with her there several years, and had children by her. Frink subsequently came back to Hoosic, and was in the poor-house there. He was in the city of Troy in 1830, and was taken to the House of Industry, where he died on the 24th of October of that year. Some ten years after Mrs. Abigail Roberts and her husband Frink had parted, she was living with J. Owens as his housekeeper. She was there married to S. Thurston, who left her the next day, and never after claimed her as his wife. She afterwards continued to live with Owens as his wife, and passed by his name until his death in March, 1826. Two or three years after Owens' death, she was married to a man by the name of Rose, and she and Rose resided and cohabited together as husband and wife until the death of Rose in January, 1838. Both of them sustained fair characters during that time, and Rose frequently, after the death of Frink, recognized her as his wife. Upon these facts the surrogate decided that the marriage to Rose during the life of Frink was void, but that the facts and circumstances proved were sufficient to warrant the inference of an actual marriage subsequent to the death of Frink, the first husband. The learned court, in its opinion, says " that an actual marriage may be inferred in ordinary cases from cohabitation, acknowledgments of the parties, &c., as well as by positive proof of the fact, there can be no room to doubt, and the only doubt in this case arises from the prove of the fact that the matrimonial cohabitation between these parties commenced previous to the death of the first husband under a contract of marriage which was absolutely

Hynes *v.* McDermott.

void previous to the Revised Statutes, although neither may have known at that time that Frink was still living.

" It appears, however, from decisions in our own courts, as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation, and general reputation, even where the parties originally came together under a void contract of marriage." The court in this case also relied upon the fact that the inception of the intercourse was matrimonial in its character, and that the parties always sustained a good reputation after the removal of the disability preventing the contraction of a valid marriage.

In the case of *Clayton* v. *Wardell* (4 N. Y. 230), the question was whether the mother of Catharine Ann Clayton at the time of her intermarriage with George Messerve was in fact the wife of Richard Schenck. The following facts appeared : that Schenck, being the reputed father of a child with which Sarah Maria Youngs, the mother of Mrs. Clayton, had become pregnant, was, on the 22nd of November, 1822, arrested as such putative father, under the provisions of the bastardy act, and entered into the usual recognizance to answer to the charge, and that no further proceedings were ever had thereon ; that in the early part of May, 1823, Sarah Maria was delivered of a child, which lived about eleven months, and then died ; that after the birth of the child, and while it lived, Schenck, for some part of the time at least, cohabited with Sarah Maria, who lived with her mother ; that it was understood among the relatives and friends of Schenck, that they were married, and Sarah Maria was received by them as his wife, and the child as his child ; that very soon after the death of the child, as early at least as the summer following, Schenck ceased to cohabit with Sarah Maria, and in June, 1825, an instrument was executed between them, in which they are described as husband and wife, and by which they mutually agreed to a separation. The principal witnesses relied upon to establish the marriage were Mrs. King and Ida Schenck, both sisters of Schenck. The other testimony on the same side was chiefly upon the question of reputation. Mrs. King and Ida Schenck lived together.

The former testified that she first heard of the marriage of her brother at the funeral of another brother, which was on the 22nd of February, 1823; that when the child was two or three months old, her brother and his wife came to her house and brought the child with them. This was the first time she had seen her brother's wife, and until then she did not know that her brother lived with Sarah Maria at her mother's. It did not appear that Schenck ever paid anything for the board of himself or his wife, or that he ever in any way contributed to her support. On the contrary, it was proved that as well after the birth of the child as before, the alleged wife supported herself by making segars; that when the child was a few weeks old, Mrs. List, the mother's sister, took the child to church and had it christened; and that when it died her husband paid its funeral expenses. Two sisters of Sarah Maria, and John Watson and his wife, also relatives of the family, all testified that they never heard her called any other name than that of Youngs before her marriage with Messerve. This marriage took place within a month of the time when the articles of separation were alleged to have been executed. She was married by the name of Sarah Maria Youngs.

From the foregoing facts and circumstances the question was whether a legal presumption of a marriage between Schenck and Sarah Maria Youngs was warranted? The court, relying upon the rule laid down by Lord ELDON in the case of *Cunningham* v. *Cunningham* (2 Dow. P. C. 482), that when the connection is at first notoriously illicit, the presumption in favor of the legality of the connection is rebutted by the fact that it was at first illicit; the presumption being that having been illicit in its origin it was likely to continue so; and that if it was subsequently changed, there should be some evidence to show when or how the change from concubinage to marriage took place; and invoking this rule, it was held that no marriage was established under the circumstances stated to have taken place between Schenck and Sarah Maria Youngs.

In the case of *Caujolle* v. *Ferrié* (23 N. Y. 90), the

Hynes *v.* McDermott.

question involved was whether Jean P. Ferrié was the legitimate son of one Jeanne Du Lux, by one Valentin Ferrié, or whether he was her natural son by said Ferrié. Jeanne Du Lux, whose original name was Jeanne Icard, was a native of Pau, a city in the south of France, where she was born in 1777.

She was the daughter of John Icard and of Magdalen Riviere, people of humble condition, residing at Pau. Her father died when she was about eight years old, and her mother afterwards went to live at Biert, a small village in the department of L'Arriege, and Jeanne, at a later period, went to service as a domestic in a family at Massat, a neighboring village. From thence, about the year 1798, she went to St. Girons, a city in the same department, and became a servant of one Anére, a merchant. Here she formed an intimacy with Valentin Ferrié, the son of Balthazar Ferrié, a tanner, and the next door neighbor of Anére, the result of which was that she was likely to become a mother. The father of Valentin objected to his marrying her, as he was desirous of doing, on account of the inequality of their social condition, the family of Ferrié being small proprietors, and the friends of Jeanne being poor, and herself a domestic servant. Shortly before her confinement, she left Anére's for a house in the outskirts of the city, where she lived with Ferrié, and where she gave birth to the respondent, on the 30th June, 1800. Prior to this, an entry had been made in a register of publications of marriage in the archives of the mayoralty of St. Girons, pursuant to the requirements of the French law, dated May 4th, 1800, whereby Valentin Ferrié and Jeanne Icard declared their intentions to execute the *acte* of their marriage on the 20th of the current month, at 10 o'clock in the morning, before the president of the municipal administration of the canton of St. Girons. In the margin of this entry there was written the French word *neant* (null or nothing) in a large hand, from which a line was drawn diagonally across the entry, which was crossed by another similar line. The ink of this marginal entry, and of the lines, was yellow and faded, and so far as could be judged, the writing was of the same date with the original record. The person who had the custody of the records at

the time was dead. The certificate of the mayor of St. Girons was produced, to the effect that no entry of any civil act of marriage of Valentin Ferrié and Jeanne Icard could be found in the archives of the city, though the book containing entries of that character, embracing the time of the birth of the respondent, existed there. Similar evidence was given in respect to the neighboring communes in which Jeanne Icard was shown, at any time, to have lived. But in the baptismal records of the parish church of St. Girons, an entry was found in the following words :

" Year 1800. Balthazar Pierre Ferrié, son of Valentin and of Jeanne Icard, was born and baptised the thirtieth of June, eighteen hundred. Godfather Balthazar Ferrié, Godmother, Rose Ferrié. In proof of this, Baque, *Cure of Ledor*."

Upon the death-bed of Jeanne Du Lux she declared that she had been married in France during the revolution, and that the respondent was her sole heir, and would take all she left. From these facts the court held that it was proper to assume that there was a marriage celebrated between Valentin and Jeanne, either *per verba de presenti* or before some proper officer, in fulfillment of their declared public intention, great stress being laid by the court in its opinion, upon the fact, that, although the commencement of the intercourse was illicit, the circumstances showed a subsequent matrimonial intent, laying down as the rule, that the presumption that an intercourse illicit in its origin continued to be of that character may be repelled by a contrary presumption in favor of marriage and of the legitimacy of offspring, although the circumstances fail to show when or how the change from concubinage to matrimony took place,—a conclusion exactly opposite to that arrived at in the case of *Clayton* v. *Wardell.*

It will be seen by reference to these cases in this state, and to others which it is not necessary to cite, to what an extent the doctrine of presumption in favor of marriage and legitimacy has been carried. In the case of *O'Gara* v. *Eisenlohr* (38 N. Y. 296), the extent to which such presumptions have been indulged in was severely criticised in the following language :

Hynes *v.* McDermott.

"Presumptions of this kind require to be made with caution, and no one can look through the adjudged cases on this subject without being convinced that the legitimate limits of presumption have too frequently been overlooked. There are many cases in the books which cannot be considered as law, and which are condemned by the best commentators (Best on Presumptions of Law and Fact, 46 ; 31 Law Library N. S. 47).

"It has been well and truly said by Mr. Gresley in his valuable treatise on equity evidence, while considering this subject, that the power of directing the jury to what length they might venture, has often been stretched beyond due limits by the judges, for in cases of hardship, they have urged juries to presume facts which were manifestly incredible (Gresley's Eq. Ev. 272, 273) ; and such are the cases of *Rex* v. *Fouring* (2 Barn. & Ald. 386), and *Wilkinson* v. *Payne* (4 Term, 468), both of which have been severely criticised ; and EYRE, Ch. B., characterized the latter case as one of ' presumption run mad.' It must be confessed that decisions of this kind, requiring courts and jurors to presume facts to be true which are probably, if not obviously, false, are pernicious, and ought not to be followed. The presuming of absurdities in order to meet the exigencies of a particular case, must ever be fraught with mischief."

But an examination of the facts of this case shows that under the evidence, as it stood, the proof was, that the defendant's first husband was living at the time that the second husband died, and thus, in order to support the second marriage, presumption must be carried to a far greater extent than ever had been done in any case before.

A brief examination of a few English cases will show that the doctrine in favor of marriage and legitimacy has been carried probably farther in the English courts than in any case which has been decided by our own tribunals. In the case of *King* v. *The Inhabitants of Twyning* (2 Barn. & Ald. 385) it was held that the law always presumes against the commission of crime, and therefore where a woman, twelve months after her first husband was last heard of, married a second

husband, and had children by him, it was held, that the sessions did right in presuming *primâ facie* that the first husband was dead at the time of the second marriage, and that it was incumbent upon the party objecting to the second marriage to give some proof that the first husband was then living, thus reversing the general rule that the law presumes the continuance of life; and that the death of neither husband nor wife will be presumed until an absence of seven years, without being heard from.

The case of *Wilkinson* v. *Payne* (4 Term, 468), was an action upon a promissory note for £180, given to the plaintiff by the defendant in consideration of the plaintiff's marrying his daughter.

The defense set up was that though there was a marriage in fact, it was not a legal one, because the parties were married by license when the plaintiff was under age, and there was no consent by his parents or guardian; in fact, both his parents were dead when the marriage was celebrated, and there was no legal guardian, but the plaintiff's mother, who survived the father, on her death bed desired a friend to become guardian to her son, with whose approbation the marriage was had. It also appeared that when the plaintiff came of age his wife was lying *in extremis* on her death bed, and died in three weeks afterwards, but in her lifetime she and the plaintiff were always treated by the defendant and his family as man and wife.

Upon these facts the court left it to the jury to presume a subsequent legal marriage, which they did accordingly, and found a verdict for the plaintiff. Upon a motion for a new trial it was contended by the defendants that if no evidence whatever of any illegal marriage had been given the presumption of a legal one might have arisen, but that in the case at bar all presumption of the legal marriage was rebutted by the fact proved, that this marriage was illegal; that it was a strong circumstance in that case that there could be no marriage after the plaintiff was of age since the supposed wife was on her death-bed, and if there was a marriage by bans before, it might easily have been proved by the plaintiff, on whom the

onus lay : that if the presumption in the case at bar could be supported, the marriage act would be totally repealed. In the decision of the case, Lord KENYON, Chief Justice, said :

"In the case of new trials it is a general rule, that in a hard action, where there is something on which the jury have raised a presumption agreeably to the justice of the case, the court will not interfere by granting a new trial where the objection does not lie in point of law. This rule is carried so far, that I remember an instance of it bordering on the ridiculous; where in an action on the game laws it was suggested that the gun with which the defendant shot was not charged with shot, but that the bird might have died in consequence of the fright ; and the jury having given a verdict for the defendant, the court refused to grant a new trial. In this case, though the first marriage was defective, a subsequent one might have taken place. The parties cohabited together for a length of time, and were treated by the defendant himself as man and wife. These circumstances therefore afforded a ground on which the jury presumed a subsequent marriage. And if there were any ground of presumption it *is* sufficient in a case like this. In this case, the parties did not intend to elude the marriage act ; but all their friends were fully informed of and concurred in the former marriage. And I think we should ill exercise the discretion vested in the court if, after the jury had presumed a subsequent legal marriage under all the circumstances of this case, we were to set aside their verdict. In a late case of *Standen* v. *Standen*, the jury presumed a legal marriage, though there was strong evidence to induce a suspicion that there had not been time enough for the bans to have been published three times."

In the *Breadalbane Case* (L. R., 1 Scotch & Div. App. 182), equally strong presumptions were indulged in, in support of the marriage. In that case, one James Campbell eloped with the young wife of a middle-aged grocer, who survived her departure about three years. About a year after the elopement they went to America, where he represented her as his wife. About two years after, the elder brother speaks of hearing from his brother James and his wife. About three years after, and

a month after the first husband's death, James Campbell and his alleged wife arrived in England, where it was open to them to celebrate a legal marriage. In 1788, they had a son, and the question in the case was whether that son was legitimate or not, that question depending upon another question, whether his parents had ever lawfully married. There was no proof whatever of any actual marriage after the death of the first husband, and before the birth of the first child, and the case was decided upon the fact that the oldest son was uniformly recognized and treated as the legitimate son of James Campbell by all the family of the Campbells, as well as by Lord Breadalbane and his relations, and the court say that "under these circumstances, every presumption is in favor of the respondent's title, and the appellant must be required to overcome that presumption by the proof of facts which are utterly inconsistent and irreconcilable with it. This he proposes to do by proving that the original cohabitation of the respondent's grandfather and grandmother commenced with an unlawful marriage after their elopement, and from that time the habit and repute began which constitutes the only evidence of a marriage between them : that there never was any marked change in the nature of the cohabitation, and that without such a change a connection which is illicit in its origin cannot become the foundation of such habit and repute as will be sufficient proof of a subsequent marriage having taken place."

Attention also is called to the contention of the plaintiff, "that beginning in an illicit connection, the presumption of subsequent marriage, from the continuance of it, altogether ceases, and that nothing short of proof of actual marriage, or of such a total change in the character of the cohabitation as will amount to habit and repute of a marriage, will be sufficient to establish the respondent's title," and the cases upon which this position is founded, viz., *Cunningham* v. *Cunningham,* supra, and *Lapsley* v. *Grierson* (1 H. L. C. 498), are adverted to at length, and it is held that even the doctrine laid down in those cases, in view of the reputation established by the evidence, did not preclude the presumption of a marriage after the death of the first husband.

The case of *Steuart* v. *Robertson* (L. R. 2 H. L. Sc. App. 494), is peculiar in many of its features.

In 1865, Major William George Drummond Steuart, the heir of a baronetcy, and of a large estate in Scotland, when nearly forty, made the acquaintance of, and became familiar with, Margaret Wilson, then sixteen, the daughter of a fishing-tackle maker in Edinburgh, in whose house a supper was given on the 13th of February, 1866; the party consisting of the Major, the father and mother of Margaret Wilson, her elder brother, and her friend, a Mrs. Kellet. After the supper the father said to the Major, "I am getting a bad name with your staying so long in my house among my three daughters." The Major answered, "I will show you what I can do to shut people's mouths. I am poor now, and cannot marry; but I will marry her in the Scotch fashion;" whereupon the Major went down on one knee, took a wedding ring from his pocket, put it on Margaret's finger, and said, "Maggie, you are my wife before heaven; so help me, oh, God." They then kissed each other; and Margaret said "Oh, Major." The health of the couple was drunk, and the entertainment was closed by the Major and Margaret being "bedded" according to an obsolete Scotch fashion.

The question was, whether the affair here described constituted a real marriage by the law of Scotland, or was only got up to sooth the father, and to "shut up people's mouths."

The Major and Margaret Wilson lived together for some weeks after the supper festivity, and at several periods subsequently; but there was no continuous matrimonial cohabitation; nor did they represent each other to third parties as husband and wife, the Major invariably repudiating the marriage, till on his death-bed he appeared, but somewhat doubtfully, to admit it, being then in a fit of *delirium tremens*.

On the 2nd of April, 1867, a son was born of the connection. The mother had it registered as *illegitimate*. The Major died on the 19th of October, 1868. She thereupon claimed alimony for the boy as a bastard, and she signed the receipts for the allowances, not as a widow but as a spinster.

On the 12th of March, 1871, she, as a spinster, married Lieutenant Robertson.

On the 14th of March, 1872, her child died.

On the 27th of April, 1872, she commenced, with her husband's concurrence, the suit in the present case, praying a judicial declaration that she had been the lawful wife of the deceased Major Steuart, and that their child, whom she had previously described as a bastard, was "their lawful son."

The first division of the Court of Session obtained opinions from the judges of the second division, and on the 27th of February, 1874, pronounced a declaration in conformity with the prayer of the summons; in other words, they, by a majority of nine judges against four, decided that the supper ceremonial, combined with the "bedding," constituted a valid marriage between Margaret Wilson and the deceased Major Steuart, and that the child was "his lawful son."

Against this judgment an appeal was taken to the House of Lords and the judgment reversed.

The Lord Chancellor (Lord CAIRNS), in delivering his opinion, before the House, gave an elaborate and detailed statement of the evidence, tending to establish the facts to have been as above stated.

He held that there was no doubt, that if the words spoken at the time of the alleged marriage, were used in fact seriously, and with the intention of constituting a marriage, they were sufficient for the purpose; and that the question was, were the words used at all, and were they used in this way and with this intention?

The conclusions arrived at were based upon the facts of want of reputation; denial of both parties that any marriage existed; that the mother had the child registered as illegitimate; that she claimed alimony for the boy as a bastard; that she signed the receipts for the allowance not as widow but as spinster, and that upon one occasion, at least, a priest had been sent for to celebrate a marriage between Major Steuart and the plaintiff—a circumstance which the Lord Chancellor seemed to think cast great doubt upon the testimony as to the previous marriage, because of the uselessness of another mar-

riage when one had already been accomplished satisfactory to all the family ; and that the child was baptised as an illegitimate child with the knowledge and approbation of Major Steuart and his alleged wife ; and that in March, 1871, the alleged wife was, as a spinster, married to Lieutenant Robertson.

The learned Lord Chancellor says that " the foregoing facts present a body of evidence of unusual weight, derived from documents written, acts done and declarations made, all bearing with a strength almost irresistible against the marriage. To countervail this evidence, the biased, inconsistent, improbable and inaccurate evidence of the alleged ceremony, is, I think, altogether inadequate."

That the difference in the position of the alleged husband and wife seems to have had some influence in the disposition of the case, is indicated by the exalted manner in which the worldly position of Major Steuart is described (he being, to use the chancellor's words) " the heir of an old family, and the future possessor of large estates, although in a moral point of view not entitled to anything beyond a very low place in the social scale," and by the pains which are taken to picture the character of the alleged wife in as unfavorable a light as the evidence could possibly warrant.

The result of an examination of these authorities seems to establish the conclusion that where the validity of a marriage and the legitimacy of children is in question, no presumption (that is founded upon any evidence whatever) in which a jury indulges for the purpose of arriving at a verdict in favor of such marriage and legitimacy, will be disturbed by the court. Therefore, the finding of a jury that a marriage was entered into between Mr. and Mrs. Hynes during their sojourn in France, is conclusive upon the court in this case.

As was held when this case was before the court upon a previous appeal, there being no evidence as to what the law of France was, it must be presumed that it is the common law, the civil law, or the law of the state of New York ; and as a marriage *per verba de presenti* entered into by parties capable of contracting, is under any one of the laws above

mentioned valid, without the intervention of any priest or magistrate, without the performance of any ceremony; and as the jury have found such a marriage to have taken place, it must be held by our courts to be valid.

In respect to the marriage which the jury found to have been celebrated in England, it seems to me that such marriage must be held to be void, because it should be governed by the *lex loci contractus*. It is urged upon the part of the plaintiffs, that this rule will not apply to the case at bar because Mr. Hynes was a resident of New York, and the jury found that he intended to return to New York with his wife. There are cases which have held, both in England and in this country, that the *lex domicilii* might be resorted to for the purpose of supporting a marriage, but in all of those cases, as far as I have been able to ascertain, the contracting parties were domiciled under the same government; and no case has decided that a marriage, celebrated in a country where one of the parties lived, and of which one of the parties was a subject, and which was void by the *lex loci contractus*, is valid.

It is urged by the counsel for the respondent that the English marriage laws apply only to English subjects. If that proposition is true, and such law does not at all regulate the marriage contract between persons not British subjects, still it must apply to a contract entered into by the plaintiff Mrs. Hynes and Mr. Hynes, because Mrs. Hynes was a British subject, resident in Great Britain and subject to its laws, and she could not make a contract except according to the requirements of that law; and if the contract of marriage was void as to her, she being an English subject, it was equally void as to Mr. Hynes, although he was an American citizen, and it was celebrated according to the laws of his domicil.

In view, however, of the conclusion at which I have arrived in reference to the presumptions which the jury had a right to draw, in respect to the French marriage, the consideration of this question becomes of little or no importance.

It is now necessary to consider briefly the exceptions taken by the defendants during the course of the examination of the

Hynes *v.* McDermott.

witnesses. The first arose under the following circumstances: Georgiana Mills had been examined as a witness *de bene esse*, and after having testified without objection that she had visited Mr. and Mrs. Hynes at their residence at Victoria Villa, London, upon the invitation of Mrs. Hynes, and after having stated among other things that she knew the plaintiffs Mary Eliza Hynes, William R. Hynes and Andrew Hynes, and also that she knew Mr. William R. Hynes, now deceased, in his life-time, she was asked, whom did she see at Victoria Villa at the time of her visit. She answered, "I saw Mr. Hynes and his wife and his child and his servants."

A motion was made to strike out before the reading of the answer the words "and his wife," and also the words "and his child," which was denied, and an exception was taken.

There was no error in this ruling. The witness, in describing Mrs. Hynes as the wife of Mr. Hynes, and the child as his child, was merely naming the persons she saw by stating the relationships which they apparently bore to him. The witness did not intend to swear of her own knowledge by the evidence she gave that the lady she saw was Mr. Hynes' wife or that the boy was his child, any more than she intended to swear of her own knowledge that the servant was his servant, but she merely described the persons whom she saw there by stating the relationship which each appeared to bear to the apparent head of the house; which evidence could not possibly convey any erroneous impression to the jury.

The same reasoning applies to the next exception, at folio 71. At folio 72, the witness was asked, "What was Mr. Hynes' general conduct towards the plaintiff?" Objected to, because witness not competent to answer the question. It appeared that the witness stayed with the family two weeks at her first visit in 1872, and that in 1873 she made another visit, and being married in August, 1873, was thereafter a frequent visitor at their house,—facts which clearly showed ample opportunity to have become acquainted with Mr. Hynes' general conduct toward the plaintiffs.

The objection at folio 94 was not well taken, for the reasons given in respect to the objection at folio 71.

The objection at folios 129 and 130 is clearly untenable ; the evidence that the witness was introduced by Mr. Hynes as his brother-in-law was clearly. competent.

The objection taken at folio 136 was to the reading of a paragraph of an answer which was competent and omitting the balance which was incompetent. The propriety of such a ruling has, as far as I have been able to ascertain, never before been questioned, and no ground of objection has been suggested by counsel.

The objection to the question at folio 214 is clearly not well taken. In actions where the issue involved is that of marriage, evidence of the conduct of the parties toward each other has always been permitted, as it frequently happens that their conduct toward each other is the very foundation of the reputation which they enjoy in the community in which they live.

The objection at folio 153 to what Mr. Hynes said about his coming back to America to reside is entirely immaterial in view of the conclusion which has been arrived at in this opinion.

The objection at folio 163 to the evidence that Mrs. Gay, one of the defendants, said that she was fully cognizant of Mrs. McCreery's (the other defendant), transactions in this suit, is not well taken. The object of the evidence was to show and it tended properly to show Mrs. Gay's knowledge of what Mrs. McCreery had done and was doing.

The objection at fol. 610 is clearly not well taken. Mrs. Hynes certainly was competent to testify when and where her children were born.

The objections at folios 611, 612, 613, 614, 615, 616, 617, 618, 619 and 620 cannot be sustained. It being claimed by the defendants that the registry of the births of these children was made by Mrs. Hynes, it was certainly competent to show by. her that no part of the entry was in her handwriting, that she had nothing to do with, nor any knowledge of it. The making of this entry certainly did not involve any transaction between Mr. and Mrs. Hynes. The objections at folios 622 and 623 to her explanation of how the bank account came to be opened in the name of Elizabeth Saunders is untenable. An act being

proven, the circumstances leading to the performance of the act may always be shown to modify or alter the influences which might be drawn from the mere act itself.

What has been said as to Mrs. Hynes' evidence as to the entries of births applies to her evidence as to the lease at folios 646 and 647.

The exception at folio 669 is not well taken. The defendants were asking Mrs. Hynes for her various residences. Among others she said " we went to Paris," which certainly, in view of the nature of the cross-examination, she had a right to do, as the question put assumed that she had not done so.

The ruling at folio 254 was entirely discretionary with the court. The fact that a woman not married can have children, seems to be a physical fact so well established that the circumstance that a woman has been the mother of a child does not seem to be very responsive to a question as to whether a woman is married or single.

The court was clearly justified in rejecting the photographs at folios 319–322 without proof as to the accuracy of the photographs or some evidence going to prove their correctness.

The exception to the admission of the petition of Mary J. McCreery is not well taken. The statements contained therein were evidence against her, and in any event, in view of the conclusion arrived at in this opinion, the evidence was entirely harmless.

The objection at folio 631 to the admission of the check book is not well taken, after proof of Mr. Hynes' handwriting appearing among the entries contained therein.

All the exceptions to the requests to charge have been disposed of by the conclusion at which this court has arrived upon this appeal, and it is not necessary to consider them in detail.

We are of the opinion, therefore, that no errors were committed upon the trial, and that the question involved in this case being one of legitimacy, in view of the current of the decisions, this court should not set aside the verdict as against the evidence, and that the jury had a right to infer from the

facts of the case, as established by the evidence, that a contract of marriage was entered into between Mr. and Mrs. Hynes during their sojourn in Paris, which (there being no evidence of what the marriage law of France is) was a valid contract.

· The judgment and order appealed from must be affirmed, with costs.

VAN HOESEN, J.—I do not agree with Judge VAN BRUNT in saying that "the jury had a right" to infer from the facts of the case, as established by the evidence, that a contract of marriage was entered into during the sojourn of Hynes and the plaintiff Mary Eliza in Paris. They had the power, not the right, to draw that inference. They decided as they did in spite of the overwhelming weight of evidence. Nevertheless, I concur in affirming the judgment and the order which have been appealed from. I do so, because I understand that in actions involving a question of legitimacy the courts support juries in acting upon what Lord Chief Baron EYRE styled "presumption run mad." What may be done in this direction is shown by the case of *Wilkinson* v. *Payne* (4 Term, 468), cited by Judge VAN BRUNT, in which Lord KENYON mentioned a case in which the court presumed that a bird died of fright, though the evidence showed that it was soaring aloft, after the manner of its kind, an instant before it fell lifeless to the ground · upon the discharge of a sportsman's shot-gun.

I affirm the judgment and the order, simply because under the rules applicable to this class of cases I cannot set the verdict aside as against the weight of evidence.

Judgment and order affirmed, with costs.*

* The judgment entered upon this decision was affirmed by the Court of Appeals, March 6th, 1883 (see 91 N. Y. 451).