### TRACY v. FREY et al.

(Supreme Court, Appellate Division, First Department. June 17, 1904.)

1. MARRIAGE—LEGITIMACY OF CHILDREN—EVIDENCE—SUFFICIENCY.

Where defendants, in a suit to redeem certain land from foreclosure, asserted an indefeasible title to the premises through conveyances from a daughter as heir of the deceased owner, and plaintiff claimed an interest through a brother of the deceased owner, who was not a party to the foreclosure, the evidence to establish the daughter's illegitimacy considered, and *held* insufficient to overcome the proof—aided by the presumptions of marriage arising from cohabitation in the apparent relation of husband and wife, and the legitimacy of children—establishing marriage and subsequent cohabitation of the parents and the birth of the daughter in lawful wedlock, entitling her to be admitted as heir of the deceased owner of the land.

Appeal from Special Term, New York County.

Action by Alberta P. Tracy against Barbara Frey, individually and as executrix, and others. From an interlocutory judgment entered on a decision of the court after trial at Special Term, defendants appeal. Reversed.

This action was commenced to redeem the premises known as No. 154 East Eighty-First street, in the city of New York, from the lien of a mortgage, which had been foreclosed thereon, and the property sold thereunder by virtue of a judgment of sale and foreclosure, the plaintiff claiming to be entitled to the equity of redemption. The property in question was owned by David W. Evans, having been purchased by him in 1849. Subsequently he gave a mortgage thereon to one Crane for $5,000, which mortgage was a lien thereon at the time of the death of said Evans, which occurred May 20, 1884. The said Evans died intestate, and, shortly after his death, Thomas Evans, of Racine, Wis., who was a brother of the whole blood, petitioned the Surrogate's Court of New York county praying that letters of administration on the estate of the deceased issue to him and one William V. Burrell, and such letters were issued accordingly in August, 1884. The petition states that the deceased left him surviving no wife or children, and that the petitioner and Hannah Stevens, a sister of the whole blood, residing in Wales, are the only next of kin of said deceased. At this time, however, there was living in the city of New Orleans, in the state of Louisiana, William L. Evans (plaintiff's devisor and father), a brother of the half blood, and six children of Sarah Davis, a deceased sister of the half blood, residing in Madison county, in the state of New York. Shortly after these letters were issued, Crane commenced a foreclosure of his mortgage, and, relying upon the statements contained in the petition for letters of administration upon the estate of David W. Evans, he made only Thomas

Evans and Hannah Evans parties defendant. The foreclosure proceeded to a judgment of foreclosure and sale, and the premises were advertised for sale, when the plaintiff discovered that the six children of the deceased sister, Sarah Davis, had not been made parties defendant. He thereupon moved to open the judgment and bring them in as parties defendant. Such proceedings were had that the said additional parties were duly made parties defendant, and another judgment of foreclosure and sale was obtained, which included these six children defendants. The premises were again advertised for sale, and in December, 1886, were sold by the referee to Kate Maria Williams for the sum of $15,100. Before the time had arrived in which the purchaser must complete the sale, the purchaser filed objections to the .title, to wit, that John Evans and the said William L. Evans, brothers of said David W. Evans and Catherine Evans, wife of the defendant Thomas Evans, had not been made parties defendant to the action. Subsequently, however, Mrs. Williams secured a deed of the premises from the six Davis children, and a release of dower from Catherine Evans, the wife of Thomas Evans, and also a deed from Hannah Stevens, the sister of David W. Evans, residing in Wales, so that Mrs. Williams had a complete title to the premises in question, save such as might belong to William L. Evans. Mrs. Williams then paid the balance due upon the mortgaged foreclosure sale, and took a deed from the .referee. Subsequently Kate Maria Williams conveyed the premises to Francis Frey, who died prior to the decision herein, and his executrix was duly substituted in his place as defendant. The plaintiff herein set forth the foregoing facts in her complaint, and further alleged that William L. Evans died prior to the commencement of this action, and upon the 27th day of August, 1897, unmarried, leaving a last will and testament, whereby he devised and bequeathed all his estate, both real and personal, to this plaintiff, and thereby an undivided one-fourth interest in the premises involved became seised in her, and has so remained.

The defendants in their answer admit the making of the mortgage, the foreclosure sale to Mrs. Williams, and the conveyance by Mrs. Williams to Mr. Frey, the defendants' predecessor in title, and allege that the said Kate Maria Williams was the daughter and sole heir at law of the said David W. Evans, and that Francis Frey, by reason of the full covenant warranty deed so made to him by Mrs. Williams, acquired an absolute and indefeasible title to the premises, and that at all times from the date of the referee's deed they, or their grantors and predecessors in title, have been in actual, open, and exclusive possession of the premises, claiming title thereto in hostility to the claim of the plaintiff, and that the plaintiff has a good and adequate remedy at law by way of ejectment, and that plaintiff ought not to have or maintain this action, because she had not instituted the same within 10 years before the alleged claim or cause of action arose.

The trial justice found that David W. Evans died intestate; that he was never married, and left no lawful descendant or father or mother, but that his heirs at law and next of kin who survived him were the said Thomas Evans, a brother of the half blood, Hannah Stevens, a sister of the whole blood, William L. Evans, the plaintiff's devisor, a brother of the half blood, and six children of Sarah Davis, a deceased sister of the half blood, and that therefore the plaintiff is entitled to an undivided one-fourth part of the premises in question as devisee under the will of her father, the said William L. Evans, whose interest in said property had not been cut off in the mortgage foreclosure on account of his not being made a party thereto. An interlocutory judgment was thereupon entered describing the plaintiff's interest in the said premises, as directed by the findings of the court, and further decreeing, pursuant to said decision: "That the plaintiff is entitled to redeem the whole of said premises upon paying into court the amount, if any, which may be found due to the plaintiff on the taking of the account hereinafter directed, less the plaintiff's costs and extra allowance hereinafter awarded, unless the defendants shall, within twenty days after the confirmation of the report of the referee, serve upon the plaintiff's attorney a written notice that they elect to retain their said estates in said undivided three-quarters in said premises, in which event plaintiff shall be entitled to redeem the said premises, exclusive of the estates of the said defendants so electing, upon paying into court

the proportionate part of the amount found due as aforesaid, less the plaintiff's said costs and extra allowance, and that said plaintiff is entitled to costs of this action to date against the said defendants." A referee was also appointed to take and state the account of what is due the said plaintiff and defendants from the income of said real property, etc. From the interlocutory judgment so entered, this appeal is taken.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Edward W. S. Johnston, for appellants.
Walter S. Logan, for respondent.

HATCH, J.. Before considering the evidence which has been given in this case, and upon which the learned court below founded its judgment, it is well to consider the rules of law which have been asserted by an almost unbroken line of decisions from very early times to the present, and which have been uniformly applied in making disposition of similar questions to the main one presented by this appeal. In the absence of proof, the presumption is of marriage arising out of cohabitation in the apparent relation of husband and wife, of the innocent and lawful character of such relationship, and of the legitimacy of children which are the fruit of such a union. In no branch of the law is the presumptive rule more rigidly enforced, and, as there seems to have been a departure by the learned court below in giving faith to these presumptions while weighing the facts, we shall the better get back to solid ground by calling attention to a few of the leading cases upon the subject.

In Fenton v. Reed' (decided by the Supreme Court in 1809), 4 Johns. 52, 4 Am. Dec. 244, it was held that, though a marriage in its inception was bigamous, and therefore null and void, nevertheless, where cohabitation was continued, matrimonial in its character, a valid contract would be presumed to have been entered into after the disability had ended.

In the leading case of Caujolle v. Ferrie, 23 N. Y. 90, the relation in its inception was meretricious, and although there was no proof of any ceremonial marriage or other contract of marriage thereafter, yet as the parties continued to cohabit together, and declarations were made upon the part of the mother that a child born of this relation was her lawful and legitimate child, it was held that a presumption of marriage subsequent to the commencement of the illicit relation would be presumed, and that a finding of a subsequent contract of marriage between the parties would be upheld, although there was no direct proof establishing the same. Mr. Justice Clarke, who delivered the prevailing opinion in the Supreme Court in that case, said:

"The common law also presumes marriage; that is, it presumes every man legitimate until the contrary be shown, as it presumes every man innocent, and that every man obeys the mandates of the law and performs his social and official duties, until the contrary be shown." 26 Barb. 177, 185.

Judge Davies, who delivered the opinion in the Court of Appeals, said:

"It being shown and conceded that the respondent was the son of the decedent, he was entitled to the letters. The presumption of the law was that he

was her legitimate son, and those who assume the fact of illegitimacy have cast upon them the onus of establishing it. The primary tribunal in the present case, and the Appellate Court, have both arrived at the conclusion that the appellant has failed to make out the status of illegitimacy. * * * The law is unwilling to bastardize children, and throws the proof upon the party who alleges illegitimacy; and, in the absence of evidence to the contrary, a child, eo nomine, is therefore a legitimate child."

And then he observes:

"I have been unable to find any authority in this case, on a question of legitimacy, which requires the heir, an acknowledged and conceded child, to prove an act of marriage as a requisite to maintain his legitimacy. The presumption and the authority of the law are in his favor, and·those who wish to bastardize him must make out the fact by clear and irrefragable proof."

In Hynes v. McDermott, 10 Daly, 423, the Presiding Justice of this court reviewed the authorities to which we have called attention, and many others, and deduced therefrom a conclusion expressed in these words:

"The result of an examination of these authorities seems to establish the conclusion that, where the validity of a marriage and the legitimacy of children is in question, no presumption (that is, founded upon any fact whatever) in which a jury indulges for the purpose of arriving at a verdict of such marriage and legitimacy will be disturbed by the court."

Therein the proof in establishment of a valid marriage was meager in the extreme, and provoked from the court this statement:

"The evidence offered upon the part of the defendant might, if any other issue than that of legitimacy was involved, call upon the court to set aside the verdict as against the evidence. * * * But in view of the fact that the law seems to have been settled that every presumption is in favor of marriage and of legitimacy, * * * notwithstanding this preponderance of evidence, the court should not set aside the verdict of the jury."

The nature and extent of the presumption was then stated, based upon a consideration of the adjudicated cases down to the time when the opinion was written, clearly, elaborately, and convincingly. This case went to the Court of Appeals (91 N. Y. 451, 43 Am. Rep. 677), where the judgment was affirmed. Judge Andrews, in delivering the opinion of the court, said:

"The presumption of marriage, from a cohabitation apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, not immorality; marriage, and not concubinage; legitimacy, and. not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."

And the learned judge quotes with approval the language of Lord Lyndhurst in Morris v. Davies, 5 Cl. & Fin. 163, wherein he states:

"The presumption of law is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory, and conclusive."

Judge Andrews further supports his own text by an abundance of quotation and authority.

In Matter of Seabury, 1 App. Div. 231, 37 N. Y. Supp. 308, the Appellate Division in the Second Department quotes the rule from the Caujolle and Hynes Cases with approval. This case also went to the Court of Appeals, where it is reported sub nomine Matter of Matthews'

Estate, 153 N. Y. 443, 47 N. E. 901, which is the last case upon this subject in this state that has fallen under our observation. Therein the opinion of the court was delivered by Martin, J., who quotes with approval the rules which we have already set forth from the Caujolle and Hynes Cases, and the learned judge adds:

"While the question of legitimacy has most frequently arisen where marriage was claimed or proved, and the nonaccess of the husband or the validity of the marriage was at issue, still it is manifest that the presumption of legitimacy is not limited to cases involving those questions. It has a wider application, and applies to every case where the question is at issue. It is based upon broad principles of natural justice and the supposed virtue of the mother. It is a branch of that general rule of equity and justice which assumes the innocence of a person until there is proof of actual guilt, and, whenever it is not inconsistent with the facts proved, this presumption is controlling. If a former marriage is necessary to sustain the presumption, it will be assumed until contrary proof is given. * *. * It is true that the precise question under consideration was not involved in some of the cases cited, yet the opinions of the learned judges and text-writers who have so fully recognized and plainly stated the presumption and grounds upon which it rests are entitled to great weight, and should be regarded as controlling. The existence of such a presumption is in consonance with every correct sense of propriety and justice. Any other rule would be fraught with danger and produce immeasurable uncertainty. Property rights would be rendered doubtful, and the fair fame of their ancestors might be destroyed by the cupidity of remote heirs and next of kin. There might be others who would be willing to dishonor their ancestors and bastardize their relatives to increase their patrimony. In the absence of the presumption, the protection of property and character would require proof of the marriage and legitimacy of ancestors, however remote, and in cases where it could not be obtained. To hold that this safeguard of the law does not exist would serve no good or proper purpose, and would overrule a beneficient principle of the law as it is now understood. We have no hesitation in adhering to the principle that the law presumes legitimacy and not illegitimacy, morality and not immorality, social integrity and not social dishonor, and in declaring such to be the law of this state."

Where it is admitted that the cohabitation of the parties is illicit in its origin, the presumption is that it so continues, and, before it can be characterized as a lawful relation, proof is required of such acts and circumstances as indicate that the relation has ceased to be illicit and become matrimonial. It was said by Judge Vann, in Gall v. Gall, 114 N. Y. 109, 21 N. E. 106, in speaking upon this subject:

"It is sufficient if the acts and declarations of the parties, their reputation as married people, and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife."

Authorities from sister jurisdictions and foreign countries announcing the rules above quoted could be rained upon these pages, wherein the same principle of law is supported and upheld. The analysis of the facts and law in the several cases to which we have called attention is elaborate and conclusive. It would be a work of supererogation to further analyze or make added quotation therefrom or from others. It can be said, without fear of successful contradiction, that the rule above quoted is the settled law of this state, and it is not to be departed from or the rightful presumptions disregarded, unless the illegitimacy be established by clear and irrefragable proof. Webster defines "irrefragable" to mean "that cannot be refuted or overthrown; incontestable; undeniable." This, then, is the law by which we are

to test the case which has been made, and which has produced the judgment bastardizing the issue of David Evans. We only find it necessary to examine the salient features bearing thereon.

It is undisputed, or, if disputed, is overwhelmingly established, that Kate Maria Williams was the fruit of a union between David Evans and Hannah Maria Van Deventer. He recognized her as his child; the mother declared him to be the father; and relatives, friends, and neighbors held the same belief. Both parties gave evidence from neighbors, friends, and relatives in the community where David Evans and Hannah Maria Van Deventer resided, and each also gave evidence of declarations of the deceased parents of Hannah Maria. This evidence came from the lips of neighbors, relatives, and friends living in the immediate neighborhood, and was therefore competent testimony bearing upon the issue involved. Badger v. Badger, 88 N. Y. 546, 42 Am. Rep. 263. The witnesses called by the plaintiff testified that the relations which existed between Evans and Hannah Maria were illicit, and that the child was illegitimate. The testimony offered by the plaintiff tended to establish this fact, while the testimony offered by the defendants tended to show that in common repute the relation which existed between these parties was that of husband and wife, and that the child was recognized as the legitimate issue of a lawful marriage. This testimony is so exceedingly voluminous as to preclude its examination in detail within any reasonable limit of an opinion. The most that can be said upon such subject is that the common repute respecting the relation of these parties was divided, and after carefully reading the whole of it we reach the conclusion that in oral statement there was about an equal division both as to quantity and quality, and standing alone it is indecisive of the question.

One essential and practically controlling element, however, appears in this connection. Nearly all of the witnesses who were interrogated upon the subject, and nearly all, if not all, of them were, testified that they understood that it was essential to a valid marriage that some ceremony be performed, either by a civil magistrate or a clergyman, and that without the ceremony no lawful marriage could exist, and that, as no ceremonial marriage was established by direct proof, the inference drawn by many of these witnesses was that it was necessarily invalid, and therefore the relation was illicit. It is evident that, as to those witnesses who hold this view, the probative force of their testimony as to the character of the relation is of little, if any, practical value, as the rule is abundantly established that, marriage being a civil contract, an agreement to marry, followed by cohabitation, is as valid a contract of marriage as it would be if solemnized with the most elaborate and ostentatious ceremony. It is evident, therefore, that we must come to a more substantial basis in the testimony than this divided repute in order to find clear, cogent, and conclusive evidence that the relation was illicit. The plaintiff claims it is found in a certain so-called bastardy record which appeared in a docket kept by Jacob H. Huffman, a justice of the peace in the township of Reddington, in the state of New Jersey, where Evans and Hannah Maria had resided. It is established that Huffman died in the fall of 1863 or 1864, and that his docket was filed in the office of the clerk of the county of Hunter-

don, in New Jersey, and it was produced from such office by the clerk of the county upon the trial. The entry in the docket was as follows:

"June 10 A. D. 1852.

"In Compliance with the Above Application I Issued A Summons Requiring the said Ebenizer A. Condit Overseer of the poor of the township of Readington to Appear Before me at the Inn of John R. Kline in the township of Clinton in said County on Wednesday the sixteenth day of June inst at two o'clock P M to show cause why the said David W. Evans should not be discharged from Confinement as aforesaid. Constable Return I served the within summons June the tenth 1852 on the Overseer of the poor of the Township of Readington by reading it to him and gave him A Copy at his request signed Morris S. Hogland. court June 16th Parties Appeared A G Richey on the part of D. W Evens Ebineizer A Condit Overseer of the poor of the township of Readington parties Being ready for trial I proceeded with the cause  Defendant Admitted that no order had Ben made for the Maintenance of the child up to this date  Was offered and received in Evidence an affidavit of Hannah M. Vandeventer taken before Isaiah P. Large, Esq., Justice seting forth that the said Hannah M. Vandeventer was on the sixteenth day of March now last past she was delivered in the City of New York of A female Bastard child of wich the said David W. Evens is the father  Affidavit marked Exbit Letter A."

This is all that appears. No order of affiliation is produced, nor does it otherwise appear that any was ever made. No disposition was made by Justice Huffman of the proceeding of which there is any record, and it does not otherwise appear that any conclusion was reached thereon.

By the provisions of the Revised Statutes of the state of New Jersey (Rev. St. 1847, p. 902, tit. 32, c. 5) introduced in evidence, provision is made for the apprehension of a person charged with being the father of a bastard, and for the making of an order of affiliation, and providing for its support. Section 4 of the chapter read in evidence provides, among other things, that an application may be made, by a person who has been committed to any jail or house of correction by virtue of the act, to one or more justice or justices of the county for his discharge, and upon such application the justice is required to summon the overseer of the poor to show cause why such person should not be discharged, "and if no order [of affiliation] shall appear to have been made in pursuance of this act, within six weeks after such woman shall have been delivered, such justice or justices shall and may discharge him from his imprisonment in such jail or house of correction to which he shall have been committed." The application was doubtless made under this provision of law, and it is evident that David Evans was for some cause, either for bastardy or otherwise, in confinement in the jail at this time. There is no evidence showing any proceeding instituted before any justice which resulted in the commitment of Evans to jail. All that appears is that an affidavit was produced purporting to have been taken before Isaiah P. Large, a justice of the peace of Hunterdon county for Readington township, which was recited in the record of Justice Huffman. What those proceedings were, who instituted them, and in what they resulted, there is no proof. All that appears is that Evans was in custody. Aside from the recital contained in Huffman's docket, this proceeding is not of consequence, as it establishes nothing, unless the recital that there "was offered and received in Evidence an affidavit of Hannah M. Vandeventer taken be-

fore Isiah P. Large, Esq., Justice seting forth that the said Hannah M. Vandeventer was on the sixteenth day of March now last past she was delivered in the City of New York of a female bastard child of wich the said David W. Evens is the father," proves something.

The contents of this affidavit are, not given, only the conclusion of the justice. There is no proof as to when it was made, the affidavit is not produced, and from all that appears, if the conclusion of Huffman was correct, such conclusion may also have been a conclusion of Justice Large without any evidence warranting it. So far as evidence goes, giving all the force to this recital that can be given, the fact is that a conclusion of the contents of a paper was stated which may have been based upon another conclusion, without evidence in support of it. If Justice Large held the same views respecting the requisites essential to evidence a valid marriage that seems to have been held by many people in that community, he might have concluded, because there was the absence of a ceremonial marriage, that therefore the relation of marriage did not exist, and, reaching such result, conclude therefrom that the child with which Hannah Maria was then pregnant was illegitimate, and drawn the affidavit accordingly; or Large might have set out all of the facts respecting the relationship existing between Evans and Hannah Maria, showing a perfectly valid marriage, and yet Huffman conclude from his view of the law that the relation was illicit, and therefore that the child was a bastard. It is evident that this testimony is of a very slender character upon which to bastardize issue. In addition to this, it appeared that Hannah Maria and Evans had some difficulty when they were residing in the city of New York, where they were living together as husband and wife, and that she left him, took her child, and returned with it to her parents, and it is not at all improbable that they undertook to obtain redress of some character from Evans. The child was born on the 16th day of March, 1852. The proceeding before Huffman bears date the 10th day of June, 1852. This was more than six weeks from the date of birth. Under the statute he could not be discharged until the expiration of six weeks after confinement, if no order of affiliation was made, and from the date of birth to the time of the institution of the proceeding, instead of being 42 days, was nearly 90 days. Evans was not discharged by Huffman, and the evidence is that Hannah Maria went to the jail and got him out. She could not, under the law, procure his discharge if the child she bore was a bastard. The justice under such circumstances, or the court to which the proceeding might be taken, would be required to make the order of affiliation and let to bail. Hannah Maria could only get him out by one of two methods: One, by establishing the marriage; the other, by establishing that the child was not the child of Evans. Adopting the record as evidence, if any inference is to be drawn from it, it is in favor of the legitimacy of the child. The most favorable assumption which can be made for the plaintiff is that Hannah Maria made an affidavit and instituted a proceeding charging Evans with being the father of her child, born or to be born out of lawful wedlock. Such charge did not establish the fact. Before the proceeding could be made effectual, it was necessary not only to apprehend Evans, but also to have a hearing in which by judicial determination it should

be decreed that the child was a bastard and that Evans was its putative father. Unless these two facts were established, the charge, no matter how plain and distinct in terms, fell utterly. No determination was ever made that the child was a bastard, and no order of affiliation is pretended to have been made. On the contrary, the proceeding before Huffman was a proceeding to discharge Evans because it had not been established that the child was a bastard, although it stands admitted that Evans was its father. Hannah Maria could therefore only legally release him from that charge by establishing the existence of a marriage relation and the child as the fruit of it, and it is more probable than any other conclusion that the reason why Evans was not held was that it appeared that the child was not a bastard, and, upon that appearing by the testimony or the efforts of Hannah Maria, Evans was released. Instead, therefore, of this record establishing that this child was a bastard, if inference is to be drawn from it, it is an inference that such fact did not exist, and for that reason the proceeding failed. If any presumption is to arise, it is that Evans was discharged from custody because he was innocent, and therefore entitled to it. He could not be innocent unless the marital relation existed, as it is nowhere contended but that he was the father of Kate Maria Williams. Instead, therefore, of this piece of evidence being available to bastardize this issue, if competent for any purpose, it refutes such conclusion.

Hannah Maria died February 21, 1863. After her death her sister marked her grave with a tombstone, which contained the inscription: "Hannah Maria Van Deventer. Born July 22, 1827. Died February 21, 1863." The plaintiff relies upon this fact as establishing that Hannah Maria lived and died a spinster, and that her child must therefore have necessarily been a bastard. It was testified to by the sister, who was present at the death of Hannah Maria, that she declared herself to be the wife of David Evans, but that Evans did not want her to be known as such or to use his name, and that she then requested her sister to mark her grave with the stone containing her name only, and that the sister after her death followed such direction and caused the stone to bear the inscription which appeared. In 1885 Kate Maria Williams had a new stone erected in place of the old. The inscription upon the old was cut upon the new, and she caused to be added thereto the name "mother." This is the evidence as it appears in connection with the erection of the tombstone. The most that can be claimed for it is that the sister thought that Hannah Maria had never been married, although she denied it; but it stands without dispute that Hannah Maria declared upon her deathbed that she was, and stated the reason why she wanted the stone marked in this manner. Certainly, the dying declaration of marriage is quite as strong as any inference to be derived from the act of the sister, and, when she testified to the circumstances and conditions which prompted her to make it, it certainly does not become of controlling force. Mrs. Williams' act in making restoration cannot add to the force of the testimony. Her belief, if she had one upon the subject, did not work an estoppel upon her, nor did it in any wise bind her; and if she was led to believe by communication from David Evans, or from other sources, that she was illegitimate, it would

not bind her as to the fact in the slightest manner. Under the evidence, therefore, the circumstance of the tombstone is of no higher worth than oral testimony of common repute, save as it is more certain in character; but it, like that testimony, is subject to the belief held by the witnesses as to what constituted a valid marriage.

Plaintiff also produced a family Bible of the Van Deventer family, and read therefrom the following entry:

| Births | Deaths |
| --- | --- |
| Hannah Maria Van Deventer, born July A. D. 22, 1827 | Hannah Maria Van Deventer died February 21st, 1863. |

Two conclusions are easily drawn from this entry. One is that it is negative testimony solely, and the other that confessedly it does not contain the whole record. Hannah Maria was the mother of Kate Maria Williams, and yet there is no record of her birth in the family Bible. It is valuable as containing a record of pedigree, but when it does not contain the whole pedigree it shrinks very much in probative force. Standing alone, it shows that Hannah Maria produced no issue, and this was not true. While family records are many times of the very highest character as evidence, yet under the circumstances of the present case this record has no greater force than the inscription upon the tombstone.

The further evidence is that on July 19, 1855, David W. Evans executed a mortgage, in which he described himself as unmarried. This mortgage and affidavit were made during the lifetime of Hannah Maria. It appeared that at this time these parties were living separate and apart. It is evident that David Evans was a somewhat eccentric man, and while it appeared that he made declarations that he was married, or had been married, to Hannah Maria, yet that he did not want people to know it; and it appears that, while he did not want Hannah Maria to bear his name, he was equally solicitous that Kate Maria Williams should. The testimony of the dying declarations of Hannah Maria, already adverted to, show the reason for this statement, and this, coupled with his declaration that he did not wish his marriage known, throws light upon the situation. He was then dealing in real estate, and it is apparent that in the execution of documents connected therewith he could be saved great inconvenience and trouble in the execution of transfers connected therewith if he passed as an unmarried man, especially as the parties were not then in harmony of relation. Subsequently, after Hannah Maria's death, he executed three mortgages, in which he described himself as a bachelor, and in an affidavit and a mortgage and a deed he described himself as "not married" or "unmarried." So far as the latter statements are concerned contained in the affidavit, the mortgage, and the deed, they were true, as confessedly at that time he was not married. So far as he describes himself as a bachelor, it has the same force, and no more, than can be ascribed to his former declaration. All of these declarations were in his interest, and are ordinarily not admisible as evidence; but waiving such question, they are not conclusive, and, while having some probative force in view of the other circumstances to be hereinafter noticed, we do not deem them controlling.

The further evidence is contained in a letter written by Kate Maria

Williams, as amanuensis for David W. Evans, to his brother Thomas, in which he states: "You ask me if I am married. I am not, but I have an adopted daughter. That is all the family I have." This letter was written under date of February 26, 1873, over 10 years after the death of Hannah Maria, and his statement that he was then unmarried, and that the daughter was all the family he had, was true. To this letter Kate Maria Williams attached a postscript, in which she recites herself as the adopted daughter of Evans, and therefore claimed Thomas as her uncle. Mrs. Williams was interrogated respecting the circumstances attending the writing of this letter, and the reason why she was named as his adopted daughter. Upon objection of the plaintiff, the explanation was excluded. It cannot therefore be claimed that no explanation was offered of this letter. So far as he states that she was his adopted daughter, it is a declaration made by him, and is entitled to some probative force, but it is the same species of evidence as that to which we have already adverted. The statement is not binding upon, and is of slight probative force against, Mrs. Williams. She was not bound by any of these statements made to her, and information conveyed by David Evans or from other sources does not have the slightest effect upon her legal status, nor bind her in any way, nor establish her illegitimacy. Information conveyed to her that she was illegitimate would not make her so, if she were in fact a legitimate child. What her father informed her during that period could have no more force in determination of the fact than would his other declarations to the same effect, even though she believed the statements.

We might conclude from all of this testimony, standing alone, that it would be sufficient upon which to base a finding of illegitimacy, and we might feel constrained to support this judgment upon the finding which has been made, although it is not nearly as strong in probative force as was the case considered in Caujolle v. Ferrie, supra, and Hynes v. McDermott, supra, where illegitimacy was rejected, and it seems to fall short of being incontestable and undeniable.

There are divers other collateral circumstances, admissions, etc., appearing in the record, to which the plaintiff calls attention. We do not, however, feel called upon to examine further in detail, as they fall into some one of the categories already discussed. The salient features as made by the plaintiff we have noticed.

To meet this case of the plaintiff the defendants gave evidence, which is not contradicted, that Hannah Maria was a respectable girl, living with her parents, who were also respectable people, and that David Evans had been bestowing his attentions upon Hannah Maria for a period of two years prior to the 4th day of July, 1851. Up to that time it is not pretended that there had been any illicit relation between them, or but that such relation as existed was that of a suitor paying his attentions to a maid. On this 4th day of July, Evans applied to and secured the permission of Mrs. Van Deventer to take Hannah Maria to Easton, near the place of the family abode, for a Fourth of July outing. The mother gave her consent, but exacted a promise from Evans that he would bring her home early. They left home, and between 8 and 9 o'clock of that evening returned, and Evans stated to the household in the presence of Hannah Maria, "We have been getting married."

He was asked for a marriage certificate, and replied that the person performing the ceremony could not get the certificate ready for them, but that he would obtain it in a few days. This was between eight and nine months prior to the birth of Kate Maria. The next morning Evans said to the mother, "I am going to take my wife with me this morning." There can be no doubt but that, if this statement be true, the declarations made by Evans to the household that night in the presence of Hannah Maria, followed by actual cohabitation, furnished evidence of a marriage contract as conclusive as evidence of a ceremonial marriage could have done. The relation between these parties based thereon would not be illicit, but begin in lawful wedlock. Acting upon the statement which Evans made, he took Hannah Maria to Charles Holcomb's hotel, Bound Brook, where he lived, and cohabited with her in the hotel, introduced her as his wife, and she introduced him as her husband. From Bound Brook the testimony by common repute was that they went to Allentown, Pa., where they continued to live together as husband and wife. Peter Vorhees testified that in 1853 or 1854 he knew Evans and visited him in New York, where he and Hannah Maria were living together as husband and wife. He saw the child there, and Evans spoke of it as his daughter, stated that they were married, but that he did not want it known to her folks. To Henry Vorhees he spoke of Hannah Maria as his wife. Kate was born while they were living together in the city of New York. Further proof was given to show that he supported Hannah Maria and the child, and clothed them; that he gave money to Hannah Maria; and that he visited her at White House, a short distance from New York, after their separation. At one time he sent for her and the baby to visit him in New York, where she stayed for a week or two. Evidence was given of declarations made by Hannah Maria that she was married, and she told her brother she had been married to Evans in New York. The witness Pickett testified that he told Evans that he ought to get married, and that Evans replied, "There is only one woman, and she is Kate's mother, and she is gone, and that ends my marrying." Proof was also offered, to which we have already referred, of the common repute of the marriage in the neighborhood where the parties lived; that Hannah Maria was received as the wife of Evans, and that the child was regarded as his legitimate issue. There are many facts and circumstances, coming from a large number of witnesses, tending to establish recognition of Hannah Maria by Evans as his wife, and of the child as his legitimate child. After the death of Hannah Maria he procured the child to be cared for, took absolute control of her, and educated her at the Drew Seminary. He also paid for the education of another girl to keep her company, and in every respect he seems to have treated her as a kind and considerate father would his own child.

This rehearsal of the evidence presents the principal features of the case upon either side, and while the testimony is infinite in detail and sheds some light, either for or against, it is not needful that we farther discuss it. There are some inconsistent declarations of the parties themselves as to when they were married, and the circumstances attending it; but it is not directly controverted but that Hannah Maria was a respectable girl; that she was taken from her home under a declaration

that she and Evans were married, and continued to live and cohabit as husband and wife at various places until a considerable period after the birth of the child, when for some unexplained reason, difficulties arose, and they separated, living thereafter in the main separate and apart. The declaration of marriage and the subsequent cohabitation, we think, must be regarded as established by satisfactory evidence, and, that being so established, it overthrows the force and effect of the facts and circumstances which have been developed by the plaintiff, and requires a finding that the marital relation existed, and that the issue therefrom was legitimate. Certainly, in view of the character of the testimony by which the plaintiff seeks to bastardize this issue, and the character of the testimony opposed thereto, it is clearly evident that, within the rules of law announced in the beginning of this opinion, the finding that Kate Maria Williams was illegitimate is opposed to the presumptions which arise in such a case, and is overthrown by the weight of testimony in aid of such presumption. Under such circumstances it cannot be said that proof which bastardizes this issue is clear and irrefragable. It has been denied and contested with an array of witnesses and facts which outweigh in our judgment the case made by the plaintiff, and calls for the reversal of this judgment.

In view of this conclusion, it is unnecessary that we should consider the other questions raised by the appellants. Many of them are serious in character, but as we are satisfied that this judgment is without that strength in evidence which the law requires to support it, it is entirely unnecessary that we consider any of the other questions involved.

It follows that the judgment should be reversed and a new trial granted, with costs to the appellant to abide the event.

O'BRIEN, INGRAHAM, and McLAUGHLIN, JJ., concur.

VAN BRUNT, P. J. I concur in the opinion of Mr. Justice HATCH, but I do not think that he gives sufficient probative force to the uncontradicted evidence as to the commencement of the matrimonial cohabitation between Evans and Hannah Maria.

It appears that, prior to the commencement of such matrimonial cohabitation, Hannah Maria Van Deventer was a respectable girl, living with her parents, who were also respectable people, and that David Evans had been bestowing his attentions upon Hannah Maria for a period of two years prior to the 4th day of July, 1851, and there is no pretense that there was any illicit relation between them during this time. On the Fourth of July, Evans applied to and secured the permission of Mrs. Van Deventer, the mother of Hannah Maria, to take her to Easton for a Fourth of July outing. They left home, and between 8 and 9 o'clock of that evening returned, and Evans stated to the household, in the presence of Hannah Maria, "We have been getting married." He was asked for a marriage certificate, and replied that the person performing the ceremony could not get the certificate ready for them, but that he would obtain it in a few days. The next morning Evans said to the mother, "I am going to take my wife with me this morning," and he took her with him, and resided with her at Bound Brook as his wife. From there they went to Allentown, Pa., where

they continued to live together as husband and wife, and this was the reputation which they bore in both places. They then appear to have moved to New York and lived together as husband and wife, where Kate Maria seems to have been born between eight and nine months after the commencement of their intercourse.

By this uncontradicted evidence, it was established beyond question that Evans and Hannah Maria Van Deventer had entered into a contract of marriage, and that their intercourse had been in fulfilment of that contract, and was matrimonial in character. It was after the intercourse between Evans and Hannah Maria had thus commenced that Kate Maria was begotten and conceived. No subsequent acts of her parents could deprive her of her birthright.