.corroborated by a motorman upon a south-bound car, who saw the collision. The driver of the wagon testified that when his horse got to the corner of Rivington street and the Bowery it took fright; that he was unable to control it, and it dashed in front of the car.

It is difficult to see upon what theory the plaintiff can uphold this judgment upon the facts as disclosed by this testimony. If we assume that negligence of the driver of the wagon, if any there was, is not to be imputed to the plaintiff (Lafferty v. Met. St. Ry. Co., 85 App. Div. 592, 83 N. Y. Supp. 405), nevertheless the defendant must be shown to have been guilty of negligence in order to enable the plaintiff to recover. In what, therefore, did the defendant's negligence consist? It is hardly to be believed that the car was at or about Delancey street when the wagon was "right on the track," as testified by the plaintiff, for, if so, we must believe that the car proceeded nearly or quite a block while a portion of the wagon was crossing the car track, which is highly improbable. There is nothing to show that the car was not under control, or that it was going at an unusual or excessive rate of speed, nor that the wagon reached the track in time to cross in safety had the car been under complete control of the motorman. That the car was under control is strongly evidenced by the fact that it proceeded a distance of only five feet after striking the wagon and that the wagon was uninjured; and the most reasonable deduction from the testimony is that it was an unavoidable accident, for which neither the driver nor defendant was to blame.

Plaintiff's attorney has handed up a brief of eight typewritten pages, presenting six points for the consideration of the court, but in no way does he make it apparent in what respect the defendant was negligent, nor point out any testimony in the case from which negligence can be inferred. The mere happening of an accident is no proof of negligence.

Judgment reversed, and new trial ordered, with costs to the appellant to abide the event. All concur.

---

(42 Misc. Rep. 463.)

## In re SCHMIDT.

### (Surrogate's Court, Kings County. January, 1904.)

1. COMMON–LAW MARRIAGE—EVIDENCE.
    A woman in good faith married a man whose wife was then living in a foreign country, and after the death of the latter, and until the death of the man, 13 years later, during all of which time the parties were known as husband and wife, she knew nothing of such former marriage. *Held* to constitute a common-law marriage between the parties.

2. DESCENT—CHILD OF COMMON–LAW MARRIAGE.
    A child of a common-law marriage, illegitimate because born while the first wife of the man was alive, is, the relation between the parties continuing after death of the first wife, under Laws 1895, p. 313, c. 531, entitled to a distributive share in his mother's estate equally with the children of the first marriage.

---

¶ 1. See Marriage, vol. 34, Cent. Dig. §§ 16, 30.

In the matter of the judicial settlement of Ottokar H. D. Schmidt, administrator of Maria Schmidt. Decree for distribution entered.

Dunphy & Pearsall, for administrator.
Bennett & Underhill, for Thomas J. Gleason, contestant.

CHURCH, S. The following facts have been agreed on by the parties: Carlos Schmidt was married in Germany on September 18, 1836. He lived with his wife for several years, and left her in 1849, and came to America. On December 10, 1864, while his wife was living, he entered into a marriage ceremony with a widow named Maria Gleason; said Maria Gleason had two children, Thomas J. Gleason, the contestant, and Helen, who has since married. While Carlos Schmidt's wife was still alive, the administrator, Ottokar H. D. Schmidt, was born to said Carlos Schmidt and Maria Gleason on September 1, 1869. Carlos Schmidt's wife died December 14, 1877. Carlos Schmidt and Maria Gleason, from the date of their marriage, lived together uninterruptedly as husband and wife, and were so regarded by all of their friends and acquaintances until the date of Carlos Schmidt's death on June 3, 1890. It appears that at one time, in conveying certain real estate, said Maria Gleason, his wife, had joined with him in the deed, being described as his wife. After his death she applied for letters of administration upon his estate as his widow, and the same were duly issued to her. During the lifetime of said Carlos Schmidt the suggestion that they were not husband and wife was never raised, and from the date of the death of said Carlos Schmidt said Maria Gleason was always known as his widow until her death on March 25, 1902. Her son, by a previous marriage, Thomas J. Gleason, the contestant here, now comes forward with the contention, however, that because at the time of his mother's marriage to Carlos Schmidt said Carlos Schmidt had a wife then living, said marriage was absolutely void, and that, therefore, his half-brother, Ottokar H. D. Schmidt, was not born in lawful wedlock, but was illegitimate, and consequently is not entitled to share in their mother's estate, but that the mother's estate should be divided solely between the contestant and his sister, the children of the previous marriage to Gleason.

It does not seem possible that a person of any respectability would, for the sake of the slight pecuniary gain involved in this estate, be willing to stamp his brother as a bastard, and to have it judicially declared that his dead mother's relations with the man she believed to be her husband were meretricious; but the courts have nothing to do with the sentimentality which should or should not prompt the parties before it, and, notwithstanding that there may be a feeling of loathing for the man who would take a position such as this contestant, yet it is nevertheless the duty of the court to consider calmly the questions of law to be applied to the admitted facts here. The facts in this case are substantially similar to those in the case of Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. Supp. 512, in which Justice Maddox held that, even if the marriage between the parties thereto was void at the time of the ceremony of marriage,

yet if, after the death of the first wife, the parties continued to cohabit and lived together as husband and wife, then the courts would presume that such cohabitation established a common-law marriage. I might well leave this case on the well-considered opinion of Justice Maddox, but the counsel for the contestant has been so insistent that Justice Maddox has overlooked certain decisions of the Court of Appeals that I have, in addition to a careful examination of Justice Maddox's opinion, examined all of the authorities upon this subject. The general proposition, no doubt, is correct that, where the relations of the parties are improper and illicit, then they are presumed to continue so, unless there is some specific fact disclosed to the court which warrants the court in drawing the conclusion that the relations have changed from being meretricious to those of husband and wife. The cases in which this contention has been advanced have been where the relations in their inception were not contracted under any mistake as to the law or the facts, but which were merely meretricious or lustful. The rule upon this matter was very well stated by Justice Maddox in Townsend v. Van Buskirk, at page 290, 33 Misc. Rep., and page 514, 68 N. Y. Supp.:

"There is, to my mind, a well-defined distinction between illicit relations, forbidden because of an undisclosed disability on the part of one of the parties thereto, and such relations as are mutually meretricious, involving on the part of the woman knowledge that its character is not, and is not intended to be, matrimonial, but of a wanton and lustful nature."

In the case at bar the complete innocence and good faith of Maria Gleason in entering into the marriage relations with Carlos Schmidt stand conceded, and Carlos Schmidt, while a wrongdoer in the sense that he married Maria Gleason when he ought not to do so by reason of his previous wife still being alive, appears to have done so in good faith, and with proper intentions, because he remained constant and true to her down to the date of his death, and for 13 years after the death of his wife they continued in every possible way to act as husband and wife. Because there was a disability which existed against their originally contracting this marriage, it does not seem possible that the court should blind its eyes to the 13 years of life as husband and wife after the disability had been removed, and I shall therefore regard their relations during that time as establishing marriage as fully as if a perfect ceremony of marriage had taken place at some time during that period.

Counsel for the contestant refers at great length to the case of O'Gara v. Eisenlohr, 38 N. Y. 296, claiming that the case is decisive, and is contrary to the views of Justice Maddox. In my judgment, that case does not touch upon the subject here under consideration at all. On the contrary, the main question in that case was the fact that the previous wife of the husband had disappeared. It was therefore contended that the court should presume that she had died before her husband, on the theory that the law will sooner presume that she had died first, which would have involved no wrong, than that which will presume that the respondent and her pretended husband were living together in adultery. That that is the sole con-

tention in the case is evidenced by the following paragraph from the opinion, at page 302:

"It is contended in this case that the presumption of law is that Rose Donnery died before her husband, when the consequence of her being alive is that the respondent in this case and Donnery were cohabiting and living together as man and wife without any lawful marital relation existing between them."

This being the sole question decided, it is therefore not a matter which should be considered as controlling in making the decision herein.

The only other case cited by the contestant upon this branch of the subject is that of Foster v. Hawley, 8 Hun, 68. But that case cannot be cited as in any way paralleling this. There the relations were concededly lustful in their origin. They were long continued, but were continued but a short time after the death of the man's first wife. It also appeared that the woman pretending to be the wife of the deceased at the termination of their relations left the deceased, and contracted a marriage with some other man.

The cases quoted by the contestant do not, therefore, in any way establish the incorrectness of Justice Maddox's previous decision. On the other hand, Justice Maddox's decision is sustained by the case of Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; Rose v. Clark, 8 Paige, 574. I shall therefore hold, assuming the ceremony of marriage between Maria Gleason and Carlos Schmidt to have been absolutely void in consequence of the fact that at that time Carlos Schmidt had a wife living, that, as Carlos Schmidt, subsequent to the death of his first wife, cohabited with Maria Gleason, and they lived together as husband and wife, a marriage will be presumed to have taken place. The act of 1895 (Laws 1895, p. 313, c. 531), which was subsequently incorporated into the domestic relations law (Laws 1896, p. 219, c. 272, § 18), provided that if the parents of a child (who would otherwise be illegitimate) subsequently married, such child would thereupon be deemed legitimate. The effect of such marriage is, therefore, to legitimatize the birth of the administrator herein, Ottokar H. D. Schmidt, and he is therefore entitled to his distributive share of his mother's estate. Let decree be prepared accordingly, with costs to the administrator, to be paid by the contestant personally.

Decreed accordingly.