## COMMON LAW MARRIAGE AND BIGAMY.

[Circuit Court of Allen County.]

DAVID F. BATES v. STATE OF OHIO.*

Decided, December 22, 1906.

*Criminal Law—Bigamy—Common Law Marriage not a Basis for Prosecution for—Cohabitation and Acknowledgment of Marriage Relation—Sections 7018, 6384 and 6394.*

Cohabitation and acknowledgment of the marriage relation by a man and woman, but without statutory marriage, do not, in Ohio, constitute a valid marriage on which an indictment for bigamy can be founded.

HURIN, J.; NORRIS, J., and DONNELLY, J., concur.

The plaintiff in error was indicted by the grand jury of Allen county for bigamy. The indictment is based on his marriage to one Isie Dora Miller, while he had an alleged wife living—one Hazel Ginter Bates. The state, at the trial of the case, relied upon evidence of what is designated as a common-law marriage of the accused with Hazel Ginter.

This evidence tended to prove that from about the 17th day of December, 1904, to some time in 1906, the accused and Hazel Ginter lived together at intervals, cohabiting together as man and wife; that a child was born to them as a result of this relationship; that their relationship as husband and wife was frequently acknowledged by the accused, who introduced her as his wife to various people; that at his mother's home she, in his presence, stated that they had been married and that he did not deny it, but thereafter, at his mother's home, occupied the same bed with Hazel Ginter and otherwise assumed the position of husband; that he rented rooms for housekeeping and bought furniture for housekeeping, stating to the landlord and to the furniture dealer that she was his wife; that when their child was about to be born, he called on several physicians and endeavored to procure their services, stating to at least

* Reversing *State v. Bates,* 4 N. P.—N. S., 502.

one of them that it was his wife who was about to be confined; that he was present comforting the woman when the child was born; and it not being born alive, he called in an undertaer and had the child buried, stating to the undertaker that this child was his child and that Hazel was his wife.

Many letters addressed by him to the woman were introduced, in all of which he used terms of affection and in one of which, dated November 12, 1904, he declares that he hopes that when they meet again they will not have to part until death parts them, and calls upon God to witness his love for her. His letters written after December 17, 1904, the date of his alleged marriage to her, uniformly refer to her parents as Pa and Ma.

Most of this evidence is not denied by the accused, who frankly admits the essential parts of it. There is no claim by the state that a formal marriage ever occurred between David F. Bates and Hazel Ginter. Nor is there any denial by the accused that shortly after the breaking off of this relationship, David F. Bates was formally married by a minister of the gospel to Isie Dora Miller, Hazel Ginter or Hazel Ginter Bates being still alive; and she was still alive at the time of the trial. On this evidence the accused was found guilty of bigamy and sentenced to the reformatory. From this judgment he prosecutes error to this court.

While an examination of the bill of exceptions discloses much that was irregular and probably erroneous, and while the motion for a new trial and the petition in error save these questions, we are explicitly asked by the counsel for the plaintiff in error to disregard all technicalities and to confine our attention to the one question as to whether an indictment for bigamy can be based upon a so-called common-law marriage followed by a marriage to another person in accordance with the statutes of the state. On account of the importance of the principle involved in this case and in the hope that our Supreme Court may once for all establish a rule as to the standing of a so-called common-law marriage in Ohio, we have concluded to confine our attention as requested by counsel to this one question.

The crime of bigamy is defined by Section 7018, Revised Statutes, as follows: "Whoever, having a husband or wife, marries another, is guilty of bigamy."

The statutes of this state, Sections 6384 and 6394 inclusive, define with great precision the requirements of the law as to marriage. These statutes definitely prescribe certain rules and formalities connected with marriage, and limit the persons who may lawfully marry. The persons and officers who may lawfully perform the marriage ceremony, and the limits of their authority are definitely specified; the publication of bans, or the obtaining of a license to marry, are declared to be prerequisites to marriage, and a rigid form of oath is prescribed before such license can be obtained, which oath includes explicit statements as to age, occupation, residence, place of birth, parentage, previous condition as to marriage, and other matters connected with the history of each of the parties to the contemplated marriage.

Certificates of the fact of marriage are required to be filed and recorded and each step thus required to be taken is to be enforced by severe punishments by fines varying from $50 to $1,000, and imprisonment not exceeding six months, which punishments, are extended not only to the parties to the proposed marriage, but to the person who performs the ceremony and the judge who attempts to issue a license not in strict accordance with law.

It thus appears that the Legislature has by most stringent rules provided for marriage in accordance with law. These requirements are in form mandatory. There is an evident purpose of the Legislature to strictly guard the institution of marriage with such legal requirements as shall effectually protect the contracting parties and all others interested, and shall at the same time safeguard the interest of the state and provide reliable records for future reference.

But notwithstanding these strict requirements of statute, it is claimed by counsel for the state that there is another form of marriage equally legal; that a marriage consummated in total disregard of the statutes will be equally valid; that a private arrangement called a common-law marriage entered into by the

parties, without a license from the state, without the publication of bans, without the services of minister or magistrate, without any ceremony whatever, without witnesses to the marriage itself, without any record of the existence of the marriage, without any definite promise of marriage, is just as effectual, just as legal and confers just the same rights upon the parties as a marriage in strict conformity to the statutory requirements which, in positive terms, specify the exact course of procedure requisite to a legal marriage, and impose severe penalties for any violation of the rules prescribed.

The proposition is a startling one. If this be true, of what use are the statutory requirements? Why punish with fine and imprisonment the minister or magistrate or probate judge who inadvertently omits to do any one of a dozen formal things required by statute to be done, when none of these things are essential to a valid marriage? Why impose upon the contracting parties the expense and labor of filing statements, under oath, regarding all sorts of statistical matters, and the procuring of a license, and the securing of the services of minister or magistrate, when all these things add nothing to the validity of a contract which they themselves may enter into without any of these formalities and without the embarrassment of witnesses? Why require statistics to be complied or provided for, when, if all these formalities are unnecessary, they will certainly be neglected and the statistics will certainly be incomplete and inaccurate?

But an examination of the question discloses the fact that from very early times in England, and for many years in certain states of this union, such marriages without legal formality have *for some purposes,* been upheld. A common-law marriage, as it is called, is a well known institution and in certain jurisdictions, has a definite standing in law.

In Ohio such marriages have been by some courts sustained for certain purposes, and, by other courts, their validity has been denied. No definite rule seems so far to have been laid down by the Supreme Court fixing the limits of their legality or invalidity, except possibly in one case to which I will allude

later; and it appears by no means easy to discover a rule which will be consistent with all the decisions so far rendered.

The importance of the subject demands for it the most careful consideration, for upon its decision depend not only the stability of the home and family, which are the very foundation of the state, but the legitimacy of children, the property rights of husband and wife, of children and heirs, as well as the reputation of citzens and their immunity from, or liability to, arrest and imprisonment.

At the very outset of the discussion we must clearly distinguish between a common-law marriage in the loose, popular use of that term, and a marriage which at common law was actually a marriage, for certain purposes. The mere fact of a man and woman living together in a state of fornication has never constituted a marriage recognized at common law, nor has a public acknowledgment of the relation of husband and wife, a holding of themselves out as husband and wife, accompanied by cohabitation, been ever deemed in itself a valid marriage at common law, although there seems to be a widespread popular notion that this constiutes a valid common-law marriage, and in this country the courts of some states have gone to great lengths in sustaining such acts as proof of an actual marriage.

At all periods of the law of England, so far as we have been able to ascertain, there was required to be an actual contract of marriage, an actual agreement of the parties to live together as husband and wife; and this, too, not as a merely temporary arrangement, but for life. And this contract was required to be actually expressed in words of mutual promise.

Much controversy has arisen as to whether such promise must, at common law, have been *per verba de futuro* or *per verba de praesenti.*

This question was fully discussed by Judge Brinkerhoff in his opinion in the case of *Duncan* v. *Duncan,* 10 O. S., 181, and he there, after a review of the authorities, concludes that notwithstanding *dicta* by judges in many cases, and even though such authorities as Kent and Greenleaf may be quoted to the contrary, no real authority can be found for the doctrine

that cohabitation, following words of future promise merely, will constitute a marriage. And he shows that the authorities cited by Kent and Greenleaf to the contrary do not in fact sustain the doctrine of the text. He quotes Blackstone (1 Com., 439) to show that such a contract was deemed a valid marriage *for many purposes* and the parties might be compelled in the spiritual courts to celebrate it *in facie ecclesiae.*

Such a promise (*i. e., per verba de futuro*), under the common law of England, just as under our law to-day, was a sufficient basis for an action for breach of promise of marriage and it seems that in England it was also a recognized basis for an action for specific performance of marriage.

But as to a promise *per verba de praesenti* there has been much more diversity of judicial opinion. In the case just cited, Judge Brinkerhoff maintains that in England even such a promise in the leading case of the *Queen* v. *Millis* (10 Clark and Finnelly's Rep., 534), was held (though by a divided court) not to have sustained the claim of a valid marriage, and that that case declares the rule of the common law. That celebrated case arose over a marriage in due form before a Presbyterian clergyman in Ireland, and a subsequent marriage by the husband to another woman, while his first wife still lived, the second marriage being performed by a clergyman of the Church of England, it being then the law that only clergymen of the established church could perform the marriage ceremony. The first marriage, not having been performed by a clergyman of the established church, but by a dissenter, was held invalid, although the parties actually pledged themselves to each other by words of present promise in good faith, believing that this was a valid marriage.

But in the case of *Carmichael* v. *The State,* 12 O. S., 553, which was apparently a case exactly parallel to the case of *The Queen* v. *Millis,* the authority of that celebrated case is repudiated by our Supreme Court, although its authority in England is fully recognized as finally stating the common law.

Regarding the conclusion of Judge Gholson, who read the opinion in the Carmichael case, it must be said with all due deference: 1st, That the opinion thus enunciated was an *obiter*

*dictum,* not necessarily involved in the case then at issue which only related to the question whether the absence of authority in the officiating clergyman or magistrate, to solemnize a marriage, *otherwise legal,* renders such marriage void. The broad question of the validity of a marriage in total disregard of the statutory law was not involved in that case; 2d, That as that case was decided before the adoption of the rule making the syllabus the law of the case, we are permitted to look to the actual facts of that case and to disregard the strict rule of its syllabus except in so far as it applies to the case then decided; 3d, That an examination of the reasoning of the learned judge, who rendered that opinion, makes it plain that his opinion is based, not on any authority in England or elsewhere, but upon his conception of what ought to be the law applicable to such a case. In fact, he reaches his conclusions after a somewhat painstaking effort to show that the English authorities suport an exactly contrary view.

In a careful review of the history of the case of *The Queen* v. *Millis* and of the law of England prior to the rendering of that opinion, he shows conclusively that not only in that case was it declared that a mere private contract of marriage "never constituted a full and complete marriage in itself unless made in the presence and with the intervention of a minister in holy orders; and that by the common law of England it was essential to the constitution of a full and complete marriage, that there must be some religious solemnity; that both modes of obligation should exist together, the civil and religious"; but that such was and had always been the law of England. not only at common law but by the ecclesiastical law, which had remained unchanged from the time of the Council of Winchester in 1076, which had by its decree declared that a marriage, without the benediction of the priest, should not be a legitimate marriage and that other marriages should be deemed fornication.

He shows also that by the civil and canon law since the Council of Trent in 1545, though as he says, the authority of that council was never admitted in England, such marriages have not been valid. Having thus shown that neither by the common law of England, nor by the ecclesiastical law, were

such private marriages valid, he proceeds to disregard these precedents and bases his opinion on the fact that in this country church and state are separated.

"The Legislature," he says, "must have proceeded on the idea of the entire inapplicability of any such rule of the common law in this state where ecclesiastical authority binds only those who render a voluntary submission, or, as is more probable, the rule of the common law in the mind of the Legislature was that shown by the certainly prevalent opinion in England prior to the decision in *Queen* v. *Millis* and almost universally accepted in this country," and he concludes by saying, "we can not construe our statute as restrictive and prohibitory, as invalidating what by natural law, the general law of society, independent of statutory prohibition, would be regarded as a valid marriage."

If the concluding sentence had been confined by the learned judge to the case which he was then discussing, a marriage duly performed in good faith by a person supposed by the contracting parties to be duly authorized to perform the ceremony, we would heartily concur; but if intended, as the syllabus apparently indicates, to apply to all private and secret marriages made in total disregard of the statutory law, the far-reaching consequences of such a holding demand for it the most careful consideration.

Nor does his first reason for disregarding the English authorities appear valid in view of the fact that the Legislature, by expressly authorizing a marriage to be performed by a civil magistrate as well as by a clergyman, plainly recognizes the separation of church and state in this country and by statute prescribes rules applicable to both magistrate and clergyman, to both a civil and religious ceremony, merely requiring that one or the other shall be used.

Ordinarily this court would feel bound, of course, to follow a decision of the Supreme Court, but a *dictum* of that court in a case not involving the exact question before us, and especially when avowedly opposed to the recognized authorities of common law, seems at least to require careful consideration before it can be applied to the case at bar, where the facts

present no analogy to those of the case, in which such *dictum* was expressed.

The Carmichael case was decided forty-five years ago. In that time there has been a vast change in the condition of society. It is a matter of common knowledge that in these latter days the stability of the family is threatened as never before by loose ideas of marriage. The family is the foundation of the state. Marriage is the basis upon which the family rests.

It seems to us that the importance of the question is such as to demand an independent consideration, and in the hope that the Supreme Court will have an opportunity of finally passing upon this question and settling the law of the state, we venture to disregard the decision of *Carmichael* v. *The State,* in so far as it seems to us to extend beyond the actual facts of that case and to lay down a rule on matters not involved therein.

In the case at bar there was no attempt on the part of David F. Bates and Hazel Ginter to comply with the law. It is plain from the evidence that they ignored the law, deliberately ignored it. Nor was there any promise of marriage, either present or future, proven by the state. Apparently the parties did not rely upon any promise of marriage.

The defendant admits a promise to marry her in the future, though this appears not to have been given as a prior inducement to the relations sustained by them, but nowhere in the bill of exceptions is there any evidence of an actual promise *in praesenti.* The state relied absolutely upon evidence as to their living together claiming to be husband and wife, and acknowledgments of that relation by both parties, and upon this testimony is based the claim of a common-law marriage and consequent bigamy.

And here we are met with numerous decisions to the effect that such evidence is admissible to prove a marriage.

In divorce proceedings the statute, Section 5698, provides that—

"Proof of cohabitation and reputation of the marriage of the parties shall be competent testimony to prove such marriage and may be, within the discretion of the court, sufficient evidence thereof."

But this was held in *Houpt* v. *Houpt*, 5 O., 539, to refer only to the marriage sought to be dissolved in the divorce proceeding, and not applicable to evidence of a former marriage assigned as a ground for the divorce.

In the early case of *Wolverton* v. *The State of Ohio*, 16 O., 173, testimony as to the admissions of a former marriage were offered to convict the accused of bigamy and the court admitted such testimony and was sustained by the Supreme Court, but that court took occasion to say that such admissions *should not* be relied on, and held by the jury, *when unsupported, sufficient to work a conviction.* See, also, *Stanglein* v. *The State*, 17 O. S., 453.

In civil cases such admissions may often establish a *prima facie* case, and are always admissible in evidence as tending to prove the fact of a disputed marriage, and they have been held in some civil cases to establish an estoppel where undenied.

See *Edgar* v. *Richardson*, 33 O. S., 593; *Bruner* v. *Briggs*, 39 O. S., 478; and such evidence is generally admitted in other states in civil cases. See *Taylor* v. *Swett*, 3 La., 33 (22 Am. Dec., 156).

In New York prior to the passage of Chapter 339 of the laws of 1901, marriage in *civil cases* could be entirely proved by cohabitation of the parties, acknowledgment, declarations, conduct, repute and the like. *Gall* v. *Gall*, 114 N. Y., 109 (21 N. E. Rep. 106); *Tracy* v. *Frey*, 88 N. Y. Supp., 874 (95 App. Div. 579); *The Matter of Schmidt*, 42 Misc., 463 (87 N. Y. Supp. 428). See, also, 15 N. Y. Annotated Cases, and extended note.

In criminal cases it was apparently necessary to have direct proof of some marriage ceremony or agreement, but evidence of reputation in the community and of holding out or introduction as man and wife could be introduced to corroborate direct proof of a *ceremonial* marriage. *Hayes* v. *People*, 25 N. Y., 390 (82 Am. Dec. 364) *People* v. *Wentworth*, 4 N. Y. Crim. Rep., 207.

The New York law of 1901 added an additional way of solemnizing marriage by permitting a written contract to be signed by both parties and subscribed by two witnesses, in the same manner provided for the acknowledgment of a conveyance of real estate, which was to be recorded; and that such contract

should be filed with the clerk of the town or city in which the marriage is solemnized within six months.

In Massachusetts and Connecticut it seems that in bigamy cases there must be proof of an actual marriage. *Commonwealth* v. *Littlejohn*, 15 Mass., 163; *Boswell's case*, 6 Conn., 446.

In Michigan, no civil or religious ceremony is required, provided the parties actually agree together to take each other as husband and wife and do so live together, yet in an action for criminal conversation an actual marriage (of some kind) must be proved, and it was said by Judge Cooley in *Hutchins* v. *Kimmell*, 31 Mich., 126; 18 Am. Rep., 164—"Such evidence of cohabitation and reputation as would be sufficient in other civil cases will not suffice where it is sought to fix upon the woman a charge of adultery."

From all of these cases and from many more which we have examined, the rule seems to be well established that in both civil and criminal cases evidence of admissions by the accused of the fact of a marriage having been performed, and evidence that the parties have lived together as husband and wife will always be admissible, and its weight is a matter to be determined by the jury from the circumstances of the case under proper instructions from the court, but that, in a *criminal case*, such evidence when supported by direct evidence of an actual marriage is not, in Ohio at least, nor in most other states, sufficient to support a conviction.

There must be in a criminal case direct evidence sufficient to establish beyond a reasonable doubt the fact that a marriage—an actual, legal marriage—has been in fact consummated or at least—as in the Carmichael case—has been attempted to be performed.

The authorities therefore that are cited by counsel to sustain the contention of the state, that marriage may be proved by evidence of cohabitation and admissions of marriage by the accused do not sustain this contention, but only go so far as to hold such evidence competent to corroborate direct evidence of an actual legal marriage.

But the question still remains, what is this actual marriage in Ohio of which direct evidence must be given. The statutes de-

termine one form of legal marriage. The state claims that another form—a so-called common-law marriage—is legal.

Our statutes are silent as to any authority for such a marriage. Our Supreme Court has not, as we have found, authoritatively sanctioned such a marriage.

In other states the rule varies. Such marriages are sustained by statutes in some of the states, notably so in Nebraska. In some states the courts· have upheld such marriages, even when statutes positively prescribe the forms of legal marriage. In the case of *Cartwright* v. *McGown*, 121 Ill., 388 (2 Am. St., 105), (12 N. E. Rep. 737) it is held that—

"Marriage is a civil contract made in due form, by which a man and woman agree to take each other for husband and wife during their joint lives, unless it is annulled by law, and to discharge toward each other the duties imposed by law upon such relation. No solemnization or other formality, apart from the agreement itself, is necessary, nor need there be any witnesses."

And in the case of *Dyer* v. *Brannock*, 66 Mo., 391; 27 Am. Rep., 339, it is held that—

"In the absence of statutory provisions pronouncing such an agreement void an agreement between parties to live together as husband and wife followed by an actual cohabitation is valid without any magisterial or clerical solemnization."

And such it seems is the rule in Utah.

While some states, e. g., New Hampshire (see *Dumbarton* v. *Franklin,* 19 N. H., 256), hold the contrary doctrine, there seems to be a decided tendency toward the theory that a so-called common-law marriage is legal. But in nearly all of these states the marriage thus recognized as a common-law marriage is not a mere cohabitation, but an actual agreement, *per verba de praesenti* to live together—followed by an actual living together —as husband and wife; and this, too, not as a temporary arrangement, but for life.

One reason assigned by Judge Gholson for upholding marriages in apparent violation of the statutes is, that, notwithstanding any statute on the subject a common-law marriage is good, *unless the statute contains express words of nullity.*

But if our understanding of the common law rule as to marriage is correct, such marriage was never good. in England, except for limited purposes and has never been adopted in Ohio and therefore the supposed historic reason for this rule as to the interpretation of statutes fails.

The marriage statutes of Ohio are in form mandatory. We have found no rule of common law or ecclesiastical law that would justify us in supposing that the Legislature meant anything else than what the statute so expressly declares. We know no rule of statutory construction that justifies us in reading into the statute a negation of its express terms. The repeated provisions for severe penalties on all those who neglect or fail to follow the precise formalities of the law as to marriage, seem to negative any idea that the Legislature ever intended or had in mind any other legal form of marriage.

It would seem a strange anomaly if a civil contract leasing real estate, or agreeing to answer for the debt of another or an agreement made upon consideration of marriage, is to be held void unless in writing signed by the parties to the agreement; yet marriage itself, the most sacred and momentous contract in its consequences which it is possible for man to enter into, may be made by merely verbal promises or even without such promises.

It is strange if our laws, in order to insure the stability of land titles, require a record of every deed and instrument conveying title, yet require (by implication) no record of the title on which the family name and honor, the property rights of wife and children, and the very legitimacy of the children themselves depends.

It is said that if common-law marriages are not upheld innocent girls will suffer in the loss of their good name, and the case at bar is cited in proof of this proposition.

We do not so view it. Hazel Ginter by all the evidence. in this case knew that she was not legally married, and proved it by her repeated statements to David Bates' mother, as an excuse for living with him, that she had been married at Celina, at Lima and in Indiana (her stories varying from time to time), and that she had a license to, verify her statements. There can be no doubt that she regarded a license and some

form of official action as essential to a legal marriage and pretended to have such license in order to support a claim which she knew to be false.

But common-law marriages, however we are to understand that term, are not yet so common as to be recognized anywhere as anything but exceptional. Our marriage laws are, and have always been, well known and understood, and a legitimate ceremonial marriage, either civil or religious, is the universal desire of all decent people contemplating matrimony.

To break down the bars established by the statute, to make possible the substitution of loose and uncertain requirements for the time honored, fixed forms of the law is to open the way to all the forms of fraud and crime with which designing men may seek to destroy womanly virtue and with which unscrupulous women may seek to appropriate the good name and wealth of men to whom in life they were perhaps perfect strangers.

If a private arrangement without any formalities, and without any writing or any record or any witnesses, is to be upheld as a civil contract; if secret marriages, known only to the parties themselves and participated in by none other are to be authorized; if the state is to have no right to protect its own interests, it is but one step further to the practice, now publicly advocated by certain notorious criminals and others, of having marriages on probation, the relation to cease at the will of either of the parties.

If such is to be the law of Ohio, some other court must be the first to proclaim it. The judgment of the court of common pleas will be reversed, and the cause remanded for further proceedings.

*Klinger & Secrest,* for plaintiff in error.

*Benjamin F. Welly,* Prosecuting attorney, for defendant in error.