(95 Misc. Rep. 161)

## In re BIERSACK.

## In re KRUSE'S ESTATE.

(Surrogate's Court, King's County. June 3, 1916.)

1. BASTARDS ⊂⊃3—DE FACTO MARRIAGE—PRESUMPTIONS.

Where legitimacy of a child born of a de facto marriage is assailed on the ground that one of the conceded parents was party to a prior marriage, the presumption favors legitimacy, and is one of the strongest presumptions of the law, being sufficient basis for adjudication, in the absence of clear and irrefragable proof of every fact necessary to defeat or escape it.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. ⊂⊃3.]

2. BASTARDS ⊂⊃6—BURDEN OF PROOF—SUFFICIENCY OF EVIDENCE.

Illegitimacy cannot be found, unless the parties holding the burden of establishing it complete a chain of evidence which will not only demonstrate the fact and validity of an earlier alleged marriage and its subsistence at the time of the later marriage, but will aggressively exclude every indication or suggestion which might conceivably rescue the second marriage from invalidity.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 9, 10; Dec. Dig. ⊂⊃6.]

3. MARRIAGE ⊂⊃40(1)—DE FACTO MARRIAGE—PRESUMPTIONS.

Where a de facto marriage is assailed on the ground that one of the parties was party to a prior marriage, though legitimacy of children is not involved, the presumption favors validity of the marriage, though it is stronger if legitimacy is at stake, and it arises when it is determined that the marriage would be valid in the absence of impediment.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 58; Dec. Dig. ⊂⊃40(1).]

4. BASTARDS ⊂⊃3—DE FACTO MARRIAGE—PRESUMPTIONS.

The presumption favoring legitimacy arises, whether the child is of a ceremonial or common-law marriage.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. ⊂⊃3.]

5. MARRIAGE ⊂⊃22—VALIDITY—DE FACTO MARRIAGE.

Under Laws 1901, c. 339, § 19, providing that no marriage shall be valid if contracted otherwise than by ceremony or recorded contract, as provided in such chapter, a nonceremonial marriage was invalid, until January 1, 1908, when the statute was amended.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 16; Dec. Dig. ⊂⊃22.]

6. COURTS ⊂⊃92—RULES OF DECISION—OBITER DICTA—SUPERIOR COURT.

A statement of law, though expressly declared unnecessary to the decision of the Appellate Division, constrains a court of first instance, especially if inspired by public interest.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 335; Dec. Dig. ⊂⊃92.]

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7.** MARRIAGE ☞40(4)—VALIDITY—DE FACTO MARRIAGE—PRESUMPTIONS.

Where parties live together as husband and wife in an attempted non-ceremonial marriage, which is forbidden by statute, it will be presumed, from their continuance of the relation after repeal of the statute, that they consummated a valid marriage as soon as the bar was removed, and this rule is without exception in this country.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 61, 62; Dec. Dig. ☞40(4).]

**8.** MARRIAGE ☞40(4)—VALIDITY—DE FACTO MARRIAGE—PRESUMPTIONS.

The presumption of valid nonceremonial marriage, arising from continuance of marital relation after removal of the bar thereto, applies as well to repeal of statutes prohibiting such marriage as to death of the spouse of one party.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 61, 62; Dec. Dig. ☞40(4).]

**9.** MARRIAGE ☞21—VALIDITY—DE FACTO MARRIAGE—EVIDENCE.

Where parties had attempted a nonceremonial marriage, which was barred by statute, and after repeal of the statute had a child of their union christened, publicly acknowledging him as their child and themselves as man and wife, there was a valid nonceremonial marriage after repeal of the statute.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 15; Dec. Dig. ☞21.]

**10.** MARRIAGE ☞40(11)—VALIDITY—DE FACTO MARRIAGE—EVIDENCE.

An otherwise valid nonceremonial marriage cannot be invalidated by proof of former marriage of the wife to one still living, unless it is shown that both parties to the former marriage were then competent to marry.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 68; Dec. Dig. ☞40(11).]

**11.** MARRIAGE ☞40(6)—VALIDITY—DE FACTO MARRIAGE—PRESUMPTIONS.

In support of an otherwise valid nonceremonial marriage, attacked on the ground of former marriage of the wife to one still living, it will be presumed that the wife had a husband at the time of her former marriage, but that he died in time to validate the later marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 64; Dec. Dig. ☞40(6).]

**12.** MARRIAGE ☞40(11)—VALIDITY—DE FACTO MARRIAGE—BURDEN OF PROOF.

One who attacks an otherwise valid marriage on the ground of former marriage of the wife to one still living must prove every fact necessary to the validity of the former marriage by comprehensive and inevitable proof.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 68; Dec. Dig. ☞40(11).]

**13.** MARRIAGE ☞40(6)—VALIDITY—DE FACTO MARRIAGE—PRESUMPTIONS.

In support of an otherwise valid marriage, attacked on the ground of former marriage of the wife to one still living, it will be presumed that the former husband had a living wife when he married, and that the common-law wife then had a husband who lived long enough to void the former marriage and died in time to validate the later marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 64; Dec. Dig. ☞40(6).]

**14.** BASTARDS ☞3—MARRIAGE—VALIDITY—DE FACTO MARRIAGE—EVIDENCE.

There is sound authority for holding that a nonceremonial marriage, contracted after repeal of the statute forbidding it, and attacked on the ground of former marriage of the wife to one still living, is valid, not

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

merely by presumption, but is actually good against any possible assault, and that a child of the common-law marriage is legitimate beyond doubt.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. ☞3.]

**15. MARRIAGE ☞54—VALIDITY—GOOD FAITH.**

Under Domestic Relations Law (Consol. Laws, c. 14) § 6, voiding a marriage of a person having a living spouse, unless such spouse has absented himself for five successive years last past without knowledge of the other that he was alive, and section 7, declaring a marriage under such circumstances void from date of declaration, to make such a marriage voidable only, there must not only be lack of knowledge that the spouse is alive, but a sincere belief after faithful inquiry that he is dead.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 93–103, 105, 106, 109; Dec. Dig. ☞54.]

**16 BASTARDS ☞14—LEGITIMACY PROCEEDINGS.**

Under Code Civ. Proc. § 1745, providing that, when a marriage is annulled on the ground that one of the parties had a living spouse, the offspring of the second marriage may be adjudged to be the legitimate child of either parent, if such parent contracted the marriage in good faith and with full belief that the former spouse was dead, or that the former marriage was annulled or dissolved, or without knowledge of it, and Domestic Relations Law, § 6, making absolutely void a marriage of a woman who has a living husband, unless he has absented himself for five successive years without being known to her as living, and section 7, providing that a marriage threatened by possible existence of a former spouse is void from declaration of nullity, which can be made only under Code Civ. Proc. § 1745, children, though of an illegal union, are legitimate, unless they are denied legitimacy in the annulment proceedings, and they may therein be declared legitimate.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. § 18; Dec. Dig. ☞14.]

**17. BASTARDS ☞3—PRESUMPTIONS.**

Though a marriage cannot be supported inter partes, the children thereof are presumed to be legitimate.

[Ed. Note.—For other cases, see Bastards, Cent. Dig. §§ 4, 5; Dec. Dig. ☞3.]

**18. JUDGMENT ☞694 — CONCLUSIVENESS — RES JUDICATA — PERSONS CONCLUDED.**

A judgment finding petitioner not to be the widow of intestate is not res judicata as to a child of the petitioner and intestate, who was not a party to the first action, but who by his guardian sues for an accounting of the administratrix.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1217; Dec. Dig. ☞694.]

Application by Louise Biersack, guardian of Frederick W. Kruse, Jr., a minor, for final account by Lena Johnson, administratrix of Frederick W. Kruse, deceased. Decree requiring the account.

Adolph Ruger, of Brooklyn (William J. McArthur, of New York City, of counsel), for petitioner.

M. P. O'Connor, of New York City (Charles E. Thorn, of New York City, of counsel), for respondent.

KETCHAM, S. This is an application by Louise Biersack, as general guardian of Frederick W. Kruse, Jr., an infant, to require the administratrix of Frederick W. Kruse, deceased, to render and settle a

final account. Louise Biersack is the mother of the infant. The intestate was his father.

It is conceded that Mrs. Biersack was married to one Bachman on June 15, 1902, that such marriage was never legally dissolved, that the parties thereto have never been divorced, and that Bachman still lives. At the time of the marriage with Bachman, Mrs. Biersack was 15 years old. Her husband deserted her 6 days after the marriage, and since his desertion there have been no relations between them. In 1903 or 1904 Mrs. Biersack and the intestate declared themselves married, and from that time until the death of the intestate, in 1911, maintained the appearance of matrimony. Their conduct in its inception and in its continuance during the life of the intestate was such as will now require the finding of a nonceremonial marriage, unless such finding is forbidden by the previous marriage or by the state of the law during their cohabitation respecting nonceremonial marriage.

There is evidence tending to show that at the time when Louise and the intestate began to live together, apparently as man and wife, and throughout the latter's life, they entertained the belief that the former husband was dead. The father of Louise testifies that "Bachman left the girl after 6 days, and never showed up in the whole time, never heard anything from him," and that before the intestate lived with his daughter he made inquiry to find out what had become of Bachman. His further testimony is:

"Before she goes with Kruse I attended to that. I said, 'I will find out what the matter is with Bachman, where he is,' and I run around and lose a lot of wages."

He swears that he went to Corona, to a sister of Bachman, and to places where he worked, and that they told him the man was dead and buried.

The sister of Louise testifies, as to a time not known, that Louise used to say of Bachman, "I wonder what became of him; is he dead or alive?" and "she [Louise] heard he was dead." The father of Louise swears that he never saw Bachman until Christmas of 1915, after the death of the intestate, that he did not ever see him before that, and that he did not receive any letters from him. The testimony of the administratrix, if believed, would show that before 1908, at a time not well defined, Louise stated that her former husband was living.

There is no evidence which would justify a finding that at any time after the lapse of 5 years from the first marriage either of them had any knowledge, actual or constructive, that the former husband was living, or that either of them abated such endeavors to find out the fact with respect to his living as reasonable persons in their situation would employ. As to the intestate, there is no intimation tending to show that he was aware of any obstruction to the marriage whatever.

The child, Frederick, was born on June 23, 1907. The intestate, by speech and action, avowed the paternity of the child in manner such only as is usual in a matrimonial relation. The infant was at once named by the full name of his father, and was known by that name during the rest of the father's life. He was christened in that name "somewhere around 1908" by a minister of the gospel, in the presence

of his father and mother, his mother's parents, and "quite a party," consisting of "good friends and neighbors." On that occasion the child's father was introduced to the officiating clergyman by the child's mother in the words, "This is my husband," and the ceremony lacked none of the features, either religious or social, which ordinarily attend the christening of a child born in honest wedlock.

The administratrix denies the right of the child, and in support of such denial alleges as follows:

"That the said Louise Biersack was never married to the said Frederick W. Kruse, the deceased, in his lifetime. nor was she his lawful wife, nor was the child, Frederick, the legitimate child of the deceased, but, on the contrary, your deponent alleges that the said Louise Biersack was the wife of another man at the time of the death of the said Frederick W. Kruse, deceased."

For the discussion thus provoked, the authorities, which will be presently reviewed, seem to yield this rule of evidence and decision:

[1] Where the legitimacy of a child born of a de facto marriage is assailed upon the allegation that one of the child's conceded parents was a party to an earlier marriage, the presumption is in favor of legitimacy. This is one of the strongest presumptions known to the law. It will prevail as the all-sufficient basis for an adjudication, unless those who attack the legitimacy make clear and irrefragable proof of every element of fact necessary to defeat or escape the presumption.

[2] Illegitimacy cannot be found unless the parties holding the burden of establishing it complete a chain of evidence which will not only demonstrate the fact and validity of the earlier marriage and its subsistence at the time of the later marriage, but will aggressively exclude every indication or suggestion which might conceivably rescue the second marriage from invalidity. Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; Caujolle v. Ferrie, 23 N. Y. 90; Hynes v. McDermott, 91 N. Y. 451, 43 Am. Rep. 677; Matter of Matthews, 153 N. Y. 443, 47 N. E. 901; Tracy v. Frey, 95 App. Div. 579, 88 N. Y. Supp. 874; Matter of Mechan, 150 App. Div. 681, 135 N. Y. Supp. 723; Barker v. Barker, 158 N. Y. Supp. 413; Maier v. Brock, 222 Mo. 74, 120 S. W. 1167, 133 Am. St. Rep. 513, 17 Ann. Cas. 673; Gamble v. Rucker, 124 Tenn. 415, 137 S. W. 499; Winter v. Dibble, 251 Ill. 200, 95 N. E. 1093. The expression of Lord Cottenham in Piers v. Piers, 2 H. L. Cas. 233, has frequently been adopted and applied. His words were:

"A presumption of this sort, in favor of marriage, can only be negatived by disproving every reasonable possibility. * * * You should negative every reasonable possibility."

[3] A presumption like unto that which assumes legitimacy is also indulged in behalf of a second marriage, even though children, the fruit thereof, are not involved. There it finds its impulse in the law's jealousy for the order of society. But the zeal of the law, which would prefer to find matrimony rather than vice, increases in its benign extravagance when it is called to the defense of legitimacy. That which is one of the strongest presumptions known to the law, when invoked in behalf of marriage, is said to be strengthened when its shield is raised above a child. Hynes v. McDermott, supra. Obviously this

presumption is called into action as soon as it is determined that the second marriage was such that it would be valid if no impediment thereto existed.

[4] If the child whose birth is doubted was the offspring of a ceremonial union, that, of course, would be enough to provoke the presumption. With equal reason and with equal force the presumption must be available to a child whose parents came together in a purpose and endeavor to contract a so-called common-law marriage. Else the presumption were a mockery. To those to whom it promised bread, it would give a stone. A marriage, whether ceremonial or contractual, which would be sufficient in the absence of the impediment, must be sufficient to invoke the presumption, for otherwise neither ceremony nor contract would be effectual to bring the presumption into play, and the rule would be stripped of every value. Its only meaning would be that every child who is found to be legitimate must be presumed to be legitimate. Mr. Justice Hatch, in Tracy v. Frey, supra, says:

"In the absence of proof, the presumption is of marriage arising out of cohabitation in the apparent relation of husband and wife, of the innocent and lawful character of such relationship, and of the legitimacy of children which are the fruit of such a union."

Judge Andrews, in Hynes v. McDermott, supra, for the court, said:

"The presumption of marriage, from a cohabitation apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy."

Indeed, the cases are numerous in which the question determined was whether or not an alliance between two persons, which was evidenced only by cohabitation and reputation, should prevail against an earlier marriage of one of the parties. Hence it must first be determined whether or not there was an apparent marriage between Frederick K. Kruse and the petitioner, Louise Biersack, of such sort that it would be declared valid in the absence of any impediment.

[5] It is manifest that from the time of their first relations down to January 1, 1908, a nonceremonial marriage was prohibited by chapter 339 of the Laws of 1901. Pettit v. Pettit, 105 App. Div. 312, 314, 93 N. Y. Supp. 1001. It is well argued by Mr. Justice Kellogg, in the Matter of Hinman, 147 App. Div. 452, 131 N. Y. Supp. 861, that the effect of that enactment was to so amend the Domestic Relations Law that during the lifetime of section 19 thereof a marriage claimed to have been solemnized in a mode other than the statutory mode, and not pursuant to the regulations of a religious society, was invalid. His opinion, however, demonstrates, at page 456 of the report in 147 App. Div., at page 865 of 131 N. Y. Supp., that the enactment of chapter 742 of the Laws of 1907 shows "the changed public policy of the state, and that the Legislature became satisfied that the provision making marriages void unless performed in a particular manner was against the public good and public morals, and that the repeal was intended to and did make common-law marriages valid in this state."

[6] It is not overlooked that the learned justice presented his views, from which this quotation is taken, with the avowal that they were not necessary to the decision of the case before him. His declaration of the law, however, constrains a court of first instance, especially in view of his statement that his opinion was inspired by a sense of public interest and by the conviction that it was not unwise to give the matter consideration. Judge Kellogg reiterated his statement that by the laws of 1907 common-law marriages thereafter contracted were valid in this state. Fisk v. Holding, 163 App. Div. 85, 148 N. Y. Supp. 501.

Again, in the Matter of Smith, 74 Misc. Rep. 11, 133 N. Y. Supp. 730, there is a deliberate, though obiter, opinion by Mr. Surrogate Herriman that upon the enactment of the act of 1907 the law was left without any declaration forbidding so-called common-law marriages after January 1, 1908. While the three cases last cited are obiter, their reasoning would be adopted by this court, even if authority which is controlling had not succeeded them.

The precise point was decided by the Appellate Division of the Third Department, on November 9, 1915, in the Matter of Ziegler, unreported. Examination of the case on appeal and of the briefs of the parties shows that but one question was involved, viz., whether or not the respondent upon the appeal was the widow of a deceased person, by reason solely of a common-law marriage. It is observable the decision was by the court in which Judge Kellogg had written in earlier cases, supra, and was joined in by him. The disposition of the appeal in the case last cited, though without opinion, means only that at all times since January 1, 1908, common-law marriage has been valid.

[7] Was there, then, a de facto marriage of the parents of the child, Frederick, after the time when the law renewed its sanction of informal nuptials? After January 1, 1908, the conduct of these parties toward each other, their behavior in the eyes of their friends and relatives, and especially their acts and speech touching the child were during the rest of the life of the intestate such as to amply betoken matrimony and nothing else. It is said that a connection illicit in its origin will be presumed to retain that character until some change is established; but it is made clear in many cases that a change which imposed upon such relations an honorable character may be shown without proof of an instant and determined act of the parties, and that the transformation may be derived from circumstances strongly indicating that the connection became matrimonial.

"It is sufficient if the acts and declarations of the parties, their reputation as married people, and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife." Gall v. Gall, 114 N. Y. 109, 118, 21 N. E. 106, 109, and cases cited.

The language quoted was applied to persons who originally entered into sexual relations solely from the impulse of lust, but who thereafter gradually emerged from a sordid life into a condition openly indicative of matrimony.

The original relation of the parties in the case at bar, though without lawful sanction, was not without a qualification. It was only the bar of the statute against a nonceremonial marriage which robbed their conduct of the quality of matrimony. So far from a cheerful submission to a vicious relation because they liked it, and chose it, the parents of the child here concerned did everything, short of a ceremonial marriage, that a man and woman needed to do to produce both the evidence and the fact of matrimony, and they failed solely because all that they could do by mere contract could not achieve a condition which the law itself forbade.

With respect to what may be needed to show a change in relations between a man and a woman, there must be a wide difference between two persons who, with open eyes and fixed intent, maintain a consort irredeemably sinful and those who, however they may strive by nonceremonial methods to achieve a marriage, are forbidden to do so by statute.

It is not intended to extenuate the behavior of this child's parents, but it is asserted that their conduct up to the time when the statutory barrier was removed may well be regarded in a search for the intention with which they approached the time when nonceremonial marriage became possible for them. The same conduct which had characterized their relation, though formerly ineffectual either to constitute or exhibit a nonceremonial marriage, becomes evidence both of a change of heart and a change in their association, when for the first time they came to a period in which such marriage was made lawful for them.

For the years before January 1, 1908, these two, by every act ordinarily appropriate to a marital contract, gave evidence of an abiding purpose, which was only defeated or suspended by the bar of the statute. During all of that time it may be said that they were leaning against an obstruction to their sincere intention and agreement, and that when the law broke down the barrier they fell forward into the proper relation towards which they had constantly inclined.

This proposition was voiced in the Breadalbanc Case (Campbell v. Campbell, L. R. 1 H. L. Sc. 182), which since the eighteenth century has been the leading case on the subject, and has impressed itself upon every opinion in which it was found available. There Campbell eloped with the wife of one Ludlow, and lived with her until his own death in 1806. Ludlow died in 1784. The question was whether Campbell was married to the woman between 1784, when she became a widow, and 1788, when she bore a child to Campbell. Respecting the suggestion that the relation, because it was originally evil, must have so continued, Lord Westbury said:

"I should undoubtedly oppose to that another, and, I think, a sounder, rule and principle of law, namely, that you must infer the consent to have been given the first moment when you find the parties able to enter into the contract. The conclusion, therefore, that I derive, and which, unquestionably, is consistent with the language of the cases which have been referred to, is that the consent between these parties was given, and the marriage, therefore, in theory of law, took place at the time when, by the death of the first husband, they became competent to enter into the contract."

Lord Cranworth said:

"We ought to infer, after their deaths, that at some time during the long period during which they lived together, and in some manner, however informal, they did that which they could do without any difficulty, viz. enter into an agreement to be and become married persons, and so to acquire for themselves and their children the status which the evidence satisfies me they wished to enjoy."

This rule has been applied in this country without question or exception. Matter of Wells, 123 App. Div. 79, 108 N. Y. Supp. 164, citing many apposite cases.

In Adger v. Ackerman, 115 Fed. 124, 52 C. C. A. 568, Judge Sanborn, writing for the Circuit Court of Appeals of the Eighth Circuit, states the rule as follows:

"The principle of law is that where parties who are incompetent to marry enter an illicit relation, with a manifest desire and intention to live in a matrimonial union rather than in a state of concubinage, and the obstacle to their marriage is subsequently removed, their continued cohabitation raises a presumption of an actual marriage immediately after the removal of the obstacle, and warrants a finding to that effect."

This statement is supported by copious citations from courts of England and of the United States.

In 1 Bishop on Marriage, Divorce and Separation, the rule is stated, at section 970, as follows:

"If the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability—as where there is a prior marriage undissolved—their cohabitation, thus matrimonially meant, will in matter of law make them husband and wife from the moment when the disability is removed; and it is immaterial whether they knew of its existence, or its removal, or not, nor is this a question of evidence."

In Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244, the earliest case in this state upon the subject of contractual marriage, the facts are significantly parallel to those presented in the case at bar. There the question was whether the plaintiff was the widow of Reed. In 1785, she was the lawful wife of Guest. In that year Guest left the state for foreign parts and continued absent until 1792, and it was reported, and generally believed, that he died abroad. In 1792, the plaintiff married Reed. Thereafter, in the same year, Guest returned to this state and continued to reside therein until 1800, when he died. After the death of Guest, the plaintiff continued to cohabit with Reed until his death, in 1806, and sustained a good reputation in society; but no solemnization of marriage was proved to have taken place between the plaintiff and Reed after the death of Guest, nor was there any evidence of marital purpose, except that which might be derived from a continuance of their former conduct. The court said:

"The marriage of the plaintiff below with William Reed during the lifetime of her husband, John Guest, was null and void. It was of no legal avail whatever, and not sufficient to constitute them husband and wife de facto. This has been the uniform and well-settled rule of the common law. 1 Roll. Abr. 340, pl. 2; Id. 357, pl. 40; Id. 365, F; Cro. Eliz. 858; 1 Salk. 120. * * * Elizabeth Reed was, then, the lawful wife of Guest, and continued so, until his death in 1800; and the true question is whether there was evidence sufficient to justify the court below in concluding that she was after-

wards married to Reed. * * * Proof of an actual marriage was not necessary. Such strict proof is only required in prosecutions for bigamy, and in actions for criminal conversation. 4 Burr. 2057; Doug. 171. A marriage may be proved, in other cases, from cohabitation, reputation, acknowledgment of the parties, reception in the family, and other circumstances from which a marriage may be inferred. 4 Burr., 2057; 1 Esp. Cases, 213; 2 Bl. Rep. 877; Peake's Cases, N. P. 231. No formal solemnization of marriage was requisite. A contract of marriage made per verba de præsenti amounts to an actual marriage, and is as valid as if made in facie ecclesiæ. 6 Mod. 155; 2 Salk. 437; Peake's Cases, 231. In the present case, there existed strong circumstances, from which a marriage subsequent to the death of Guest might be presumed. The parties cohabited together as husband wife (sic), and under the reputation and understanding that they were such, from 1800 to 1806, when Reed died; and the wife, during this time, sustained a good character in society."

[8] In the case cited the living spouse of one of the parties was the impediment afterwards removed. In the present case the statute prior to January 1, 1908, was the impediment which was then removed. No distinction can be imagined by which the dispensation constantly afforded to parties living in an unlawful state and waiting for a death which would make their condition lawful can be withheld from persons living in a like state and waiting for a change in the law which would permit them to legalize their relations.

Fenton v. Reed, supra, is followed in cases where the parties maintained relations during the lifetime of the spouse of one of them, and after the death of the former spouse merely persisted in the same relations. Jackson v. Claw, 18 Johns. 346, in which there was no proof of the death of the obstructing wife, but merely a presumption of her death; Rose v. Clark, 8 Paige, 574; Matter of Wells, supra; Townsend v. Van Buskirk, 33 Misc. Rep. 287, 68 N. Y. Supp. 512; Adger v. Ackerman, supra; 1 Bishop on Marriage, Separation & Divorce, § 970 et seq.

Fenton v. Reed is clearly adopted and reaffirmed as the law of this state, and is accepted throughout the country, though not without an occasional discord.

[9] But in the present case there was much more than the continuance of the previous behavior of the parties beyond the time when the prohibition of the statute was lifted. While all this persisted, and was itself enough to manifest and effect marriage, the sobriety and resolution of the parties in their endeavors to live together in honor were exemplified by new and convincing evidence. "Some time around 1908," at the christening of their child, they solemnly testified to their matrimonial intent and relation, and pledged themselves in the future to the dignities and duties of the marriage state. On that occasion they assembled the parents of the mother and their own friends and neighbors to witness a ceremony which was consistent only with the existence and recognition of a truly wedded companionship. The father was then introduced by the mother to a minister of the gospel with the words, "This is my husband," and the child was thereupon named in the name of Christ with the full name of his father, and with such consecration to a Christian fellowship and life as may be derived from the usual nature of the ceremony. There was thus a publication by them of their own mari-

tal condition and of the honorable birthright of the infant, under the sanctions of the church, and the less holy, but equally significant, cognizance of society.

Both parents, in their constancy and decorum throughout the remainder of the father's days, hourly maintained and proclaimed their state of marriage; but, if no other evidence were afforded, the baptism of the child alone would constrain the adjudication that they were husband and wife, unless proof is now forthcoming that their union could not by any possibility have been lawful.

The administratrix respondent has confessed the burden of proof which rests upon her, and has given evidence that the mother of the infant was a party to a ceremony of marriage with Bachman before she met the intestate. In an effort to discharge her burden of proof, she has made it clear that there has been no annulment of that ceremony, that the parties thereto have not been divorced, and that Bachman is now living. No other evidence, however, is suggested tending to show that the former marriage was a subsisting impediment to the wedding of the intestate and the petitioner.

It is not a violent inference that the administratrix gave the court all that she had. Evincing by her efforts at the trial a full knowledge of the presumption, and the responsibility thereby placed upon her to produce proof to exclude every possibility that the child's birth could be honest, she, by her failure to negative every potential fact by which the later marriage might have been validated, confesses that she has tried to find available proof and has been deprived of it only because it did not exist.

[10, 11] There is nothing to show that the petitioner and Bachman were both competent to marry. Non constat but that each of them was married to a living spouse at the time of the ceremony between them. Unless it be affirmatively shown that Bachman was not then already married, the petitioner must be found to have been free to marry the intestate. Unless, in like manner, it shall appear that the petitioner was not then married, her marriage to the intestate must be upheld, since in support thereof it will be assumed, not only that she had a husband before her marriage to Bachman, but that he died just in time to give validity to her nuptials with the intestate.

[12] It is not for the administratrix to say that it was unlikely that Bachman had a living wife when he married the petitioner, or that a woman of 15 years had previously been married. Proof—comprehensive and inevitable—is the only thing that she can supply to satisfy the law. Probability may often be called to the aid of evidence, but it can never help when there is no evidence. It is never in itself alone either proof or the equivalent of proof, but, whatever may ordinarily be its probative value, none of it is for this respondent.

The zeal of the law for legitimacy, already fantastic, will not check at an application of the presumption which is no more eccentric than the principle itself. The tender, but stern, compassion which enfolds this child has girt him about with a defense against which hostile force may prevail only by annihilation.

159 N.Y.S.—34

[13] The scope of this principle is such that the decision of this case must proceed as it were proven truth (1) that Bachman had a living wife when he married the petitioner, and (2) that the petitioner then had a husband who lived long enough to avoid that marriage and died in time to impart validity to her later marriage. United States v. Green (Circuit Court, S. D. of Iowa) 98 Fed. 63. In Chancey v. Whinnery (Okl.) 147 Pac. 1036, it is said:

"The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it that such requirement is enforced, even though it involve the proving a negative. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void."

See also Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Rep. 245; Sparks v. Ross, 75 N. J. Eq. 550, 73 Atl. 241; Barker v. Barker, 158 N. Y. Supp. 413.

The rule is stated as follows, with numerous authorities:

"In the case of conflicting marriages of the same spouse, this presumption (of validity) operates in favor of the second marriage. Accordingly the burden of showing the validity of the first marriage is on the party asserting it, and even where this is established it may be presumed in favor of the second marriage that at the time thereof the first marriage had been dissolved, either by a decree of divorce or by the death of the former spouse, so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage." 26 Cyc. 880.

This requires the finding that the child, Frederick, is the legitimate son of the intestate.

[14] There is sound authority for the holding that the marriage now in question is not merely valid by presumption, but is actually good against any possible assault, and that the child's status as a legitimate son is fixed beyond doubt. It will be the finding in this case that the marriage took place in 1908, or later, at a time when Bachman had absented himself for more than five successive years, and that the petitioner then believed upon ample and honest inquiry that he was dead.

[15] A marriage is absolutely void, if contracted by a woman whose husband by a former marriage is living, unless such former husband has absented himself for five successive years then last past without being known to her to be living during that time. Domestic Relations Law, § 6. Section 7 of the Domestic Relations Law then provides that the marriage threatened by the possible existence of a former spouse is void from the time when its nullity is declared by a court of competent jurisdiction. These sections are construed to contain a dispensation in favor of the second marriage, which is conditioned, not upon the mere lack of knowledge by the previously married person of the existence of the former spouse, but only upon a sincere belief in his death, reached after faithful inquiry. Stokes v. Stokes, 198 N. Y. 301, 91 N. E. 793.

Actions to annul a void or voidable marriage may be brought only

as provided by the Code of Civil Procedure (Domestic Relations Law, § 7). Section 7 has been given the settled meaning that the marriage which is voidable within its terms is void only when so pronounced by judgment. Stokes v. Stokes, 198 N. Y. 301, 91 N. E. 793; Matter of McKinley, 66 Misc. Rep. 126, 122 N. Y. Supp. 807.

It follows that in the meantime such marriage is as good as any marriage can be, and that, since it has all the virtue of a lawful marriage between the parties thereto, until otherwise declared, it has a fortiori the effect to make its offspring legitimate. This proposition is involved in and is expressly stated by Mr. Surrogate Davie in Matter of McKinley, supra, with a citation of cases, to which may be added White v. Lowe, 1 Redf. Sur. 376.

The McKinley Case concerned the claim of one who demanded a widow's rights in the estate of an intestate by virtue of her marriage to him at a time when she had a living husband. The considerations upon which the learned judge held the marriage good, because it had not been annulled, apply with at least equal force to the case at bar. But, if there were doubt of the views last stated, there would still remain potential facts which must be assumed to be true, in the absence of proof to the contrary, and which upon such assumption will require an adjudication of legitimacy.

[16] The provision of the Code of Civil Procedure (section 1745), under which alone an action of annulment is possible, provides that, when the marriage is annulled upon the ground that one of the parties thereto was the husband or wife of a former spouse, the offspring of the subsequent marriage may be adjudged to be the legitimate children of either parent, if it be found that such parent contracted the later marriage in good faith and with full belief that the former husband or wife was dead, or with the belief that the former marriage had been annulled or dissolved, or without any knowledge of such former marriage.

Sections 6 and 7 of the Domestic Relations Law, with section 1745 of the Code, form a statutory design that the children of a marriage which depends for its validity upon the questions of fact indicated in these sections may still be legitimate, even though they be the product of a relation which itself is found to be void. Such children are not only within the grace of the general presumption argued supra. The statute surrounds them with its own presumption, since by its literal interpretation they must remain legitimate until in an action for annulment they are denied legitimacy. If, however, the action has become impossible by reason of death, the most indulgent construction for which the respondent can ask is that she may now show the facts which would have required a finding of illegitimacy if presented in an action.

But whether by force of the general presumption, or of the assurance of legitimacy which the statute affords, the burden must still rest upon the respondent to make aggressive proof sufficient to exclude the possibilities by which legitimacy might be accomplished. Among these, and typical of many, is the rational hazard that the intestate may have married the petitioner without knowledge or

warning that she had previously married. There is no evidence tending to reveal the intestate's condition of mind as to either the existence or the persistence of the petitioner's earlier marriage.

[17] In the argument hitherto, the presumption in favor of marriage and the presumption in favor of legitimacy have coincided. We now deal only with the principle that, even though the marriage cannot be supported inter partes, there is still the presumption that its progeny is legitimate, and there is nothing to countervail the presumption. Hence, on this ground, the finding must be in favor of the child. This was the result reached by Mr. Justice Blackmar in Barker v. Barker, 92 Misc. Rep. 390, 156 N. Y. Supp. 194, through a train of reasoning not wholly identical with that employed supra. It is a welcome duty to find that the infant is the legitimate son of the intestate, and is entitled to a decree that the administratrix render and settle her account with him.

[18] The finding heretofore made, that the petitioner was not the widow of the intestate, is set up as a former adjudication. That conclusion was reached in a proceeding in which the child was not a party, and it cannot be invoked against him.

A decree accordingly may be presented.